**Brad BANGERTER, Plaintiff–Appellant,**

v.

**OREM CITY CORPORATION, a
Utah Municipal Corporation,
Defendant–Appellee.**

No. 92–4150.

United States Court of Appeals,
Tenth Circuit.

Jan. 11, 1995.

Robert B. Denton, Legal Center for People with Disabilities, Salt Lake City, UT, for plaintiff/appellant.

Jody K. Burnett of Williams & Hunt, Salt Lake City, UT, for defendant/appellee.

Before BRORBY, McWILLIAMS, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiff–Appellant Brad Bangerter ("Bangerter"), a mentally disabled adult, alleges that zoning actions taken by Defendant–Appellee, Orem City, Utah ("Orem"), violated the Fair Housing Act, codified as amended by the Fair Housing Act Amendments of 1988 ("FHAA") at 42 U.S.C. § 3601 *et seq.* In particular, Bangerter claims that conditions placed by Orem on zoning approval for a group home for the mentally retarded in which Bangerter lived, and the Utah statute and local ordinance pursuant to which those conditions were imposed, discriminated against Bangerter because of his handicap in violation of the FHAA. The district court dismissed Bangerter's claims pursuant to Fed.R.Civ.P. 12(b)(6), and he now appeals. We hold that the district court prematurely dismissed this action and incorrectly applied an equal protection analysis to Bangerter's statutory claims under the FHAA. Accordingly, we reverse and remand.

## I. BACKGROUND

In late December 1989, Utah mental health officials discharged Bangerter from the Utah State Developmental Center to a group home in an Orem residential neighborhood zoned R–1–8, single family residential. Although technically designated as "single family," Orem allows a number of uses in its R–1–8 zone category, including nurses' homes, foster family care homes, convents, monasteries, rectories, and, pursuant to state law, group homes for the elderly. Appellee Supp.App. at 15–16, 19–21. In addition, Orem allows group homes for the mentally or physically handicapped to be located in areas zoned R–1–8 provided that the homes obtain a conditional use permit.[1] Utah law expressly outlines special conditions that localities can impose on the granting of zoning permits for group homes for the handicapped. Utah Code Ann. § 10–9–2.5.[2] The group home

---

1. The record before us suggests that the conditions that Bangerter complains of (i.e. the 24–hour supervision and the citizen's advisory committee) are *not* conditions that could be imposed on at least some of these other multiple uses. *Compare* Utah Code Ann. § 10–9–2.5(2) & (3) (1953) *with* § 10–9–2.6(2)(a) & (3) (1953). (We note that these statutes, while in effect during the events which gave rise to this lawsuit, have since been repealed and replaced by Utah Code Ann. § 10–9–601–604 and § 10–9–501–504 respectively. However, the new statutes largely resemble their predecessors.) Thus, the bare record before us suggests that group homes for the handicapped are treated differently in these regards from other group home uses in R–1–8 zones.

2. Utah Code Ann. § 10–9–2.5 (1953) provides in relevant part:

(2) Each municipality shall adopt ordinances which establish that a residential facility for handicapped persons is a permitted use in any area where residential dwellings are allowed, except an area zoned to permit exclusively single-family dwellings. Those ordinances shall establish a permit process which may require only that:
(a) the facility meet all municipal building, safety, and health ordinances applicable to similar dwellings;
(b) the operator of the facility provide assurances that the residents of the facility will be properly supervised on a 24–hour basis;
(c) the operator of the facility establish a community advisory committee through which all complaints and concerns of neighbors may be addressed;
(d) the operator of the facility provide adequate off-street parking space;
(e) the facility be capable of use as a residential facility for handicapped persons without structural or landscaping alterations that would change the structure's residential character;
(f) no residential facility for handicapped persons be established or maintained within three-quarter mile of another residential facility for handicapped persons;

into which Bangerter was placed was established pursuant to a contract between the home's operator, RLO, Inc. ("RLO"),[3] and the Division of Services for People With Disabilities of the Utah State Department of Human Services ("Division").[4] However, RLO had not obtained a conditional use permit, as required by an Orem ordinance promulgated pursuant to Utah Code Ann. § 10–9–2.5,[5] when Bangerter moved to the group home to live with three other mentally retarded men. At Orem's insistence, RLO subsequently applied for the permit, which the Orem City Council granted, subject to

(g) no person being treated for alcoholism or drug abuse be placed in a residential facility for handicapped persons;

(h) no person who is violent be placed in a residential facility for handicapped persons; and

(i) placement in a residential facility for handicapped persons be on a strictly voluntary basis and not a part of, or in lieu of, confinement, rehabilitation, or treatment in a correctional facility.

Upon application for a permit to establish a residential facility for handicapped persons in any area where residential dwellings are allowed, except an area zoned to permit exclusively single-family dwellings, a facility that conforms to ordinances adopted by the municipality pursuant to this subsection shall be granted a permit.

The municipality may decide only whether the residential facility for handicapped persons conforms to those ordinances. If the municipality determines that the residential facility for handicapped persons is in compliance with those ordinances, it shall grant the requested permit to that facility.

. . . .

If a municipality had not adopted ordinances in accordance with this subsection at the time an application for a permit to establish a residential facility for handicapped persons is made under the terms of this subsection, the municipality shall grant the permit if it is established that the criteria set forth in this subsection have been met by the facility.

(3) Subject to the granting of a conditional use permit, a residential facility for handicapped persons shall be allowed in any municipal zoning district which is zoned to permit exclusively single-family dwelling use, if that facility:

(a) conforms to all applicable health, safety, and building codes;

(b) is capable of use as a residential facility for handicapped persons without structural or landscaping alterations that would change the structure's residential character; and

(c) conforms to the municipality's criteria, adopted by ordinance, governing residential facilities for handicapped persons in areas zoned to permit exclusively single-family dwellings.

A municipality may, by ordinance, provide that no residential facility for handicapped persons be established or maintained within three-quarters mile of another existing residential facility for handicapped persons.

The use granted and permitted by this subsection is nontransferable and terminates if the structure is devoted to a use other than as a residential facility for handicapped persons or, if the structure fails to comply with applicable health, safety, and building codes.

For purposes of this subsection, placement in a residential facility for handicapped persons shall be on a strictly voluntary basis and may not be a part of, or in lieu of confinement, rehabilitation, or treatment in a correctional institution.

(4) Municipal ordinances shall prohibit discrimination against handicapped persons and against residential facilities for handicapped persons. The decision of a municipality regarding application for a permit by a residential facility for handicapped persons must be based on legitimate land use criteria, and may not be based on the handicapping conditions of the facility's residents.

As noted in footnote 1, this statute, has since been repealed and replaced by Utah Code Ann. §§ 10–9–601–604. However, the new statute largely resembles its predecessor.

**3.** RLO was purchased by Chrysalis Enterprises ("Chrysalis") in February 1991 and Chrysalis became the operator of the group home.

**4.** The Division has authority to plan, develop, and manage services, including facilitating the least restrictive, most enabling residential environment, for mentally retarded persons. Utah Code Ann. §§ 62A–5–103, 62A–5–102(2). Under Utah law, residential facilities for handicapped persons must conform "to all applicable standards and requirements of the Department of Social Services ("DSS"), and [are] operated by or operated under contract with the department." Utah Code Ann. § 10–9–2.5(1)(b). Bangerter does not challenge the DSS's authority to regulate residential facilities for the handicapped. Therefore, we do not decide whether the DSS's criteria for group homes for the disabled violates the FHAA.

**5.** Neither party included a copy of the Orem City ordinance for our review. Because § 10–9–2.5 allows municipalities to apply the provisions of the statute without having passed an ordinance adopting the statute's provisions, we review the conditions imposed on the group home in light of the statute. The parties assume that the Orem ordinance follows the Utah statute. We note that Bangerter is not challenging the Utah statute but rather is challenging only the Orem ordinance as applied to him.

conditions permitted under Utah Code Ann. § 10–9–2.5, after reviewing the application during public hearings held in February and March 1990.

In granting the permit on March 13, 1990, the Council imposed two conditions on the group home that Bangerter alleges violate the FHAA:

> [1] [the group home operator] had to ensure the City that the residents were properly supervised on a twenty-four-hour basis; [and]

> [2] [the group home operator] had to establish a community advisory committee through which all complaints and concerns of the neighbors could be addressed.

Appellant App. at 7, Complaint ¶ 26.[6]

On March 15, 1991, Bangerter was transferred to a different group home in Provo, and he has not since lived at the RLO–Chrysalis group home in question in the instant action. Bangerter filed this action on March 13, 1992 in federal district court asking for declaratory, injunctive, and monetary relief based on the following two alleged causes of action: (1) that the conditions allowed by Utah Code Ann. § 10–9–2.5 and imposed by the Orem City Council in granting the conditional use permit were preempted by and in violation of the FHAA;[7] and (2) that the conditional use permit application process violated the FHAA because the public hearings held by the Council subjected Bangerter to threats and disparaging personal remarks and required him and the other residents of the group home—unlike residents of a group home without mental retardation—to ask the City's permission to live together, Appellant App. at 11–12, Complaint ¶¶ 38–43.[8]

In response to Bangerter's complaint, Orem filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), and the court dismissed both of Bangerter's causes of action. The court first addressed the issue of standing and concluded that Bangerter possessed standing to challenge the imposition of the 24–hour supervision requirement because Bangerter belongs to a protected class under the FHAA and alleged an actual injury in the form of the 24–hour supervision requirement's interference with his ability to live independently and his right of privacy. *Bangerter v. Orem City Corp.*, 797 F.Supp. 918, 921 (D.Utah 1992). The court held that Bangerter lacked standing to challenge the imposition of the community advisory committee requirement, however, because that condition only affected the group home operator and did not present any threatened or actual injury to Bangerter. *Id.*

On the merits, the court held that Bangerter alleged a prima facie case that Orem's housing ordinance violates the FHAA because it treats handicapped individuals differently from non-handicapped residents. *Id.* at 922.[9] Nonetheless, the court concluded that the challenged ordinance and the 24–

---

**6.** Bangerter's complaint lists a third condition that was imposed on the group home: that RLO certify to the City, from a state-licensed psychologist or board-certified psychologist or psychiatrist, that the residents of the home were not violent or a direct threat to the community. Whether this condition violates the FHAA is not before us, however, because its enforcement was held in abeyance pending a Department of Housing and Urban Development investigation into Orem's alleged violations of the FHAA, and there is no suggestion in the record that it was ever implemented. Appellant App. at 7–8, Complaint ¶ 27.

**7.** Specifically, Bangerter alleged that the conditions severely and intentionally discriminated against him because of his handicap, invaded his privacy, restricted his ability to enjoy an independent and normal living setting, restricted his ability to live in the residence of his choice because of his handicap, placed conditions on his living arrangement that are not imposed on non-handicapped persons, and did not comply with the reasonable accommodation provision of the FHAA. Appellant App. at 9–11, Complaint ¶¶ 31–37.

**8.** Bangerter also included a claim in his complaint under 42 U.S.C. § 1983. The court dismissed Bangerter's § 1983 claim due to his failure to allege underlying facts sufficient to support his conclusory charges and because Bangerter's counsel conceded that no constitutional violations had taken place. *Bangerter*, 797 F.Supp. at 921–22. Bangerter does not appeal that decision.

**9.** The court characterized the differential treatment as a discriminatory "effect" and stated that Bangerter did not allege that Orem possessed a discriminatory motive in adopting the challenged ordinance. *Bangerter*, 797 F.Supp. at 922.

hour supervision requirement did not violate the FHAA because they were rationally related to the legitimate government interest of integrating the handicapped "into normal surroundings." *Id.* at 922–23.[10] The court also held that Orem could not be held liable for any statements made at the public hearings, and thus dismissed Bangerter's second cause of action. *Id.* at 923.

Bangerter does not appeal the district court's dismissal of his second claim, and thus we do not address it on appeal. However, as to Bangerter's appeal of the court's dismissal of his first cause of action, we hold that the district court incorrectly evaluated the challenged conduct under the FHAA and impermissibly relied on factual findings in dismissing Bangerter's complaint.

## II. DISCUSSION

We first address the issue of standing and then proceed to the merits of Bangerter's claims to assess whether Bangerter has stated a legally sufficient claim upon which relief could be granted.

### A. Standing

█ Orem has not appealed the district court's finding that Bangerter had standing to bring this action with respect to the 24–hour supervision requirement. Nevertheless, we must address the issue sua sponte because standing involves a constitutional limitation on a federal court's jurisdiction. *Alexander v. Anheuser–Busch Cos., Inc.,* 990 F.2d 536, 538 (10th Cir.1993). We also review the district court's ruling, which Bangerter did timely appeal, that Bangerter did not have standing to challenge the condition

that RLO establish a neighborhood advisory committee. We further review Bangerter's somewhat oblique claim that he was injured by the conditional permitting scheme in general apart from the public hearings which Bangerter did not challenge on appeal.[11] We hold that Bangerter has adequately alleged standing to challenge the 24–hour supervision requirement and the neighborhood advisory committee requirement, but that he has not alleged standing to challenge the permitting process generally. On remand, the district court should conduct a factual inquiry to determine whether Bangerter can prove his allegations of personal injury.

█ Standing under the Fair Housing Act extends "to the full limits of Art. III." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979)); *Housing Authority of the Kaw Tribe of Indians v. City of Ponca City,* 952 F.2d 1183, 1193 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). Courts thus lack authority to erect prudential barriers to restrict the standing of plaintiffs bringing suit under the FHAA beyond the constitutional parameters erected by Article III. *Havens,* 455 U.S. at 372, 102 S.Ct. at 1120–21. The Constitution requires three elements for standing: (1) actual or threatened injury; (2) a causal connection to the conduct complained of; and (3) redressability of the injury by the requested relief. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).[12] We review de novo the district

---

**10.** The court prefaced this ruling by concluding that the Fair Housing Act did not "preempt" state or local regulations, like those in Utah and Orem, that establish standards for facilities for the mentally ill. *Bangerter,* 797 F.Supp. at 922.

**11.** This third claimed injury was not directly addressed by the district court.

**12.** Bangerter must also show actual or imminent personal injury to possess statutory standing under the FHAA. The FHAA vests "aggrieved persons" with a civil cause of action. 42 U.S.C. § 3613(a)(1)(A). An "aggrieved person" is defined as any person who "(1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). After a claimant has established that he or she has been aggrieved, the FHAA provides that remedies for discriminatory housing practices include "actual and punitive damages, and subject to subsection (d) of this section [regarding bona fide transactions consummated without notice that a discrimination complaint has been filed], ... as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C. § 3613(c)(1).

court's decision regarding Bangerter's standing under Article III. *Hackford v. Babbitt,* 14 F.3d 1457, 1465 (10th Cir.1994).

■ As a preliminary matter, we note that the district court correctly found that Bangerter, a mentally retarded adult, is within the class of persons protected by the FHAA. In amending the Fair Housing Act, or Title VIII of the Civil Rights Act of 1968, in 1988, one of Congress's explicit motivations was to extend federal protections against housing discrimination to individuals with physical or mental handicaps. *See* 42 U.S.C. §§ 3602 & 3604.

■ Furthermore, the FHAA's prohibitions clearly extend to discriminatory zoning practices. The House Committee Report accompanying the FHAA states that the FHAA "is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of [the handicapped] to live in the residence of their choice in the community." H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 24 (1988) U.S.Code Cong. & Admin.News 1988, pp. 2173, 2185. Prohibited practices include not only those that make the sale or rental of housing unavailable, 42 U.S.C. § 3604(f)(1),[13] but also those that impose discriminatory

> terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold or rented, or made available; or
>
> (C) any person associated with that person.

**13.** Section 3604(f)(1) states that it shall be unlawful:

> [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
> (A) that buyer or renter;
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

42 U.S.C. § 3604(f)(2). Thus, Bangerter may bring suit under the FHAA to challenge the restrictions placed on the operation of his group home even though the home was issued a conditional use permit.

Nevertheless, Bangerter must still allege specific personal injuries resulting from Orem's purportedly discriminatory housing practices to have standing to bring this action under Article III and under the FHAA. We look to his complaint to assess whether he has asserted a redressable injury. It is important to note that because Bangerter no longer lives in the group home—and did not when he brought this lawsuit—and because he does not allege a likelihood of moving back into the home, the only relief available to him is money damages for the past harm that he has suffered.[14] As to that past harm, Bangerter alleges several injuries.

■ First, Bangerter alleges that the 24–hour supervision requirement imposed by Orem on his group home constituted intentional discrimination against mentally handicapped persons, invaded his privacy, restricted his ability to enjoy an independent and normal living setting, and restricted his ability to live in the residence of his choice in a manner to which others without disabilities are not subjected, all in violation of his rights under the FHAA. Appellant App. at 9–11, Complaint ¶¶ 31–37. We conclude that these allegations sufficiently state a concrete personal injury so as to satisfy the standing requirements of Article III. However, at the motion to dismiss stage, we do not know to what extent or in what manner Orem imposed the 24–hour supervision requirement. Therefore, we express no opinion on the ability of Bangerter to *prove* the existence of the alleged injuries; that question is properly reserved for the district court on remand. *Gladstone,* 441 U.S. at 115 n. 31, 99 S.Ct. at

> (C) any person associated with that buyer or renter.
>
> 42 U.S.C. § 3604(f)(1).

**14.** It is well settled that declaratory and injunctive relief—both requested in this case—are inappropriate where there is no allegation that the plaintiff will confront the challenged conduct again in the future. *Facio v. Jones,* 929 F.2d 541, 544 (10th Cir.1991).

1616 n. 31 ("Although standing generally is a matter dealt with at the earliest stages of litigation, ... it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.").

■ Second, Bangerter alleges that he was injured by Orem's condition that RLO establish a community advisory committee through which all complaints and concerns of the neighbors could be addressed. It is unclear exactly how this requirement injured Bangerter, because the requirement was imposed on the operator of the group home and not on the residents of the home—a point highlighted by the district court. Unlike the 24–hour supervision requirement, for example, the citizen's committee would not seem to restrict directly Bangerter's lifestyle as a resident of the group home. On appeal, Bangerter claims that the committee would likely talk about Bangerter's personal affairs, intrude on his privacy, stigmatize him, and isolate him in the community. However, neither on appeal nor in his complaint has Bangerter explicitly alleged that the committee was formed while he lived in the home, actually talked about him, or caused or threatened to cause any of these injuries in fact. Nevertheless, because Bangerter has alleged that this provision has "severely restricted [his] ability ... to enjoy an independent and normal living setting, and ... invaded his privacy," Appellant App. at 9, Complaint at ¶ 33, we cannot conclude that he has failed to plead a legally cognizable injury. However, whether Bangerter can actually demonstrate the existence of this injury is an entirely different matter. It is not self-evident that a citizens advisory committee, even if one had been formed and did render input, necessarily would cause Bangerter the kind of concrete, demonstrable injury that would sustain standing for him to complain under the FHAA. On remand the district court should carefully evaluate whether Bangerter can show that he was injured in a personal and concrete way by the committee.

■ Finally, Bangerter claims injury from having to go through the process of obtaining a conditional use permit. This claim is not based on any statements made at the public hearings, which the district court held could not be the basis of liability for Orem—a ruling which Bangerter did not appeal. Furthermore, Bangerter alleges no tangible injury to himself from Orem's permitting process, and he cannot merely allege a general injury suffered by RLO as a result of this process. (It should be kept in mind that RLO and not Bangerter obtained the permit.) Moreover, the permitting process did not keep Bangerter from obtaining housing since the permit was issued, and Bangerter has not alleged that the requirement that RLO obtain a conditional use permit significantly delayed his housing or increased the price of that housing. Thus, Bangerter is left arguing that the mere fact that RLO had to go through a special permitting process somehow invaded *his* rights. This is insufficient to allege any personal injury from the general permitting process, and Bangerter thus fails to state sufficient allegations to maintain standing to bring that claim.

Having concluded that Bangerter adequately alleged standing to challenge the 24–hour supervision requirement and the citizen's committee requirement, we proceed to address the merits of those claims. Because we have held that Bangerter did not allege a discrete personal injury related to his generalized attack on the requirement that a permit is required for handicapped group housing, we do not rule on the validity of Orem's general permitting scheme.

### B. *The Merits*

■ Bangerter attempts to show that Orem has violated the FHAA by intentionally discriminating against him as a handicapped person, taking actions that produced discriminatory effects against him, and failing to provide reasonable accommodations in its zoning policies. The district court stated that Bangerter did not allege that Orem acted with a discriminatory motive, and thus could not state a claim for discriminatory intent.[15] *Bangerter,* 797 F.Supp. at 922–23.

**15.** Before reaching the substance of Bangerter's claims, the district court analyzed whether the

The court concluded that Bangerter made out a prima facie case of discrimination because the challenged statute and ordinance treat the handicapped differently on their face. *Id.* at 922. Nonetheless, the court concluded that no cause of action could be stated against Orem based on its permitting ordinance because the permitting process was rationally related to the legitimate governmental interest of ensuring integrated housing for the disabled. *Id.* at 922–23. However, this conclusion must have been based on the district court's own perceptions of evidence outside of the record. Nothing in Bangerter's complaint would warrant such a factual conclusion, which, of necessity, requires a balancing analysis involving evidence yet to be presented by Orem. Thus, even if the district court applied the correct legal standard, we would have to reverse, because the court improperly went beyond the pleadings in granting the motion to dismiss. However, we also conclude that the district court utilized the wrong legal standard in applying the FHAA, and that also requires us to reverse and remand for reconsideration under the proper standard.

We first consider the nature of Bangerter's claims under the FHAA and conclude that Bangerter's action should be construed only as one for intentional discrimination. Next we outline the elements of an intentional discrimination claim and hold that Bangerter has made allegations sufficient to state a claim of intentional discrimination under the FHAA and to withstand a motion to dismiss. Finally, we outline the legal standard the district court should apply to review Bangerter's claims and Orem's possible defenses on remand.

### 1. Characterization of the Claim as One for Intentional Discrimination

We hold, contrary to the district court, that Bangerter's claims are properly characterized as claims of intentional discrimination and should be analyzed in the established framework for such claims. Here, the Act and the Orem ordinance facially single out the handicapped and apply different rules to them. Thus, the discriminatory intent and purpose of the Act and Ordinance are apparent on their face. Whether such discrimination is legal or illegal remains to be determined, but there can be no doubt that the Act and Ordinance are discriminatory.[16] As the Supreme Court has stated in the Title VII context, "Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the dis-

---

FHAA preempted state and local regulation of group homes for the handicapped. The court concluded that the FHAA does not preempt the Utah statute at issue because "Congress did not intend to abrogate a state's power to determine how facilities for the mentally ill must meet licensing standards." *Bangerter,* 797 F.Supp. at 922 (quoting *Familystyle of St. Paul v. City of St. Paul, Minn.,* 923 F.2d 91, 94 (8th Cir.1991)). The court was certainly correct in concluding that the FHAA does not completely preempt all state and local regulation of housing for the disabled. However, the Utah statute and Orem ordinance are preempted to the extent that they violate the Fair Housing Act. *See Home Mortgage Bank v. Ryan,* 986 F.2d 372, 375 (10th Cir.1993). The FHAA expressly provides that:

> [n]othing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this subchapter shall be effective, that grants, guarantees, or protects the same rights as are granted by this subchapter; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a

discriminatory housing practice under this subchapter shall to that extent be invalid. 42 U.S.C. § 3615. Thus, the law of a state or municipality is expressly preempted by the Fair Housing Act if it is a "discriminatory housing practice" under the Act. *See Potomac Group Home v. Montgomery County, Md.,* 823 F.Supp. 1285, 1299 (D.Md.1993). As such, the question of whether the Orem provisions challenged in this action are preempted by federal law does not guide our inquiry as it does not present a distinct issue from whether Bangerter has stated a valid claim that Orem has violated the FHAA.

**16.** There is no need to probe for a potentially discriminatory motive circumstantially, or to apply the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as the statute discriminates on its face by allowing conditions to be imposed on group housing for the handicapped which would not be permitted for non-handicapped group housing. *See Reidt v. County of Trempealeau,* 975 F.2d 1336, 1340–41 (7th Cir.1992) (explaining this distinction as to Title VII actions).

crimination." *International Union, United Auto., Aerospace & Agric. Implement Workers v. Johnson Controls, Inc.,* 499 U.S. 187, 199, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991). Moreover, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Id.* Specifically with regard to housing discrimination, a plaintiff need not prove the malice or discriminatory animus of a defendant to make out a case of intentional discrimination where the defendant expressly treats someone protected by the FHAA in a different manner than others. *See Potomac Group Home,* 823 F.Supp. at 1295 ("To prove discriminatory intent, a plaintiff need only show that the handicap of the potential residents [of a group home] ... was in some part the basis for the policy being challenged.") (quotation omitted); *Horizon House Dev. Servs., Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 694, 696 (W.D.Pa.1992), *aff'd,* 995 F.2d 217 (1993); *Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Comm'n of Fairfield,* 790 F.Supp. 1197, 1211 (D.Conn.1992).[17] Thus, a plaintiff makes out a prima facie case of intentional discrimination under the FHAA merely by showing that a protected group has been subjected to explicitly differential— i.e. discriminatory—treatment.

■ In applying a discriminatory intent analysis to this case, we do not imply that FHAA claims cannot also be based on the discriminatory effect of a facially neutral policy. It is widely accepted that an FHAA violation can be demonstrated by either disparate treatment or disparate impact. *See, e.g., Doe v. City of Butler, Pa.,* 892 F.2d 315, 323 (3d Cir.1989); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934–35 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 146–47 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499

(1978); *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack, Mo.,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). We also do not suggest that the differential treatment in this case has not caused a "disparate impact" on the handicapped in an everyday sense—as probably all intentional discriminatory treatment does. However, the legal framework for discriminatory effects, or disparate impact, claims remains inappropriate for this case. "A disparate impact analysis examines a facially-neutral policy or practice, such as a hiring test or zoning law, for its differential impact or effect on a particular group. Disparate treatment analysis, on the other hand, involves differential treatment of similarly situated persons or groups." *Huntington Branch,* 844 F.2d at 933 (internal citations omitted); *see also Reidt,* 975 F.2d at 1340 (explaining the difference between disparate treatment and disparate impact cases in the Title VII context). Because Bangerter challenges facially discriminatory actions and not the effects of facially neutral actions, we conclude that his claim is one of disparate treatment and not disparate impact.

■ We also conclude that Bangerter has not stated a valid claim that Orem's refusal to waive the 24–hour supervision and community advisory committee requirements constitutes a refusal by Orem to make a reasonable accommodation for the handicapped in its zoning policies. Under the FHAA, discrimination on the basis of handicap includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3). However, the thrust of a reasonable accommodation claim is that a defen-

---

17. That is not to say that a government can never justify any intentional differential treatment of the handicapped. Some differential treatment may be objectively legitimate. In the Title VII context, for example, facially discriminatory treatment is permitted if it represents a bona fide occupational qualification ("BFOQ") that is rea-

sonably necessary to an employer's operations. 42 U.S.C. § 2000e–2(e); *Johnson Controls,* 499 U.S. at 200–01, 111 S.Ct. at 1204–05. We address the issue of potential justifications for discriminatory treatment under the Fair Housing Act below.

dant must make an affirmative change in an otherwise valid law or policy. By one court's definition, a "reasonable accommodation" involves "changing some rule that is generally applicable so as to make its burden less onerous on the handicapped individual." *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J.1992). Here, Bangerter does not challenge an ordinance that is generally applicable, since it is specifically directed at group homes for the handicapped. Under these facts, we conclude that the claim for "reasonable accommodation" is simply inappropriate and the district court correctly dismissed that claim.

### 2. Dismissal Under Fed.R.Civ.P. 12(b)(6)

■ Applying a discriminatory treatment framework, we hold that the district court improperly dismissed Bangerter's action. A court faced with a 12(b)(6) motion must "accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir.1991). Because "[g]ranting defendant's motion to dismiss is a harsh remedy which must be cautiously studied ... to protect the interests of justice," *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir.1986), a court should grant such a motion "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1148 (10th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989). We review de novo a district court's dismissal for failure to state a claim upon which relief can be granted. *Morgan*, 792 F.2d at 978.

■ We agree with the district court's initial conclusion that Bangerter made out a prima facie case of discrimination under the FHAA. *Bangerter*, 797 F.Supp. at 922. "The ultimate question in a disparate treatment case is whether the defendant intentionally discriminated against plaintiff." *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir. 1993). Here, the imposition of special condi-

tions on the permit granted for Bangerter's group home, and the ordinance and statute pursuant to which the conditions were authorized, expressly apply only to group homes for the handicapped. In particular, it was alleged that the 24–hour supervision condition regulated the lives of Bangerter and the other handicapped residents of the group home in a way not suffered by non-handicapped residents of other group homes. Thus, Bangerter's complaint states a direct claim of facially discriminatory treatment of handicapped persons.

Nonetheless, the district court dismissed Bangerter's action because the court concluded that the challenged restrictions were "rationally related to a legitimate governmental purpose." *Bangerter*, 797 F.Supp. at 922 (quotations omitted). However, there was no basis in this record to conclude—at least not on a 12(b)(6) motion—what legitimate government purposes were involved or how these restrictions related to those purposes. Orem's justifications for its actions certainly cannot be found within the confines of Bangerter's complaint. Focussing solely on Bangerter's pleadings, we conclude that Bangerter states a legally sufficient claim of discrimination under the FHAA and reverse the district court's dismissal.

### 3. Issues for Remand

On remand, Bangerter will have to introduce evidence to support his allegations of discrimination. Besides proving sufficient concrete personal injury to maintain standing, Bangerter must support his basic claim that his group home was subjected to conditions not imposed on other group homes in Orem that were permitted in areas zoned R–1–8 for single family residences. If Bangerter cannot show that group homes for the non-handicapped are permitted in Orem without requirements like the 24–hour supervision or neighborhood advisory committee requirements, he will have failed to show that he has suffered differential treatment when compared to a similarly situated group, and his claims will fail under the FHAA.[18]

---

18. The "reasonable accommodation" provision of § 3604(f)(3) provides an additional definition of discrimination that does not require proof of

differential treatment, but as noted previously in this opinion, the facts of this case do not raise a "reasonable accommodation" claim.

In addition, on remand the district court will have to consider Orem's justifications for its discriminatory treatment of Bangerter and its proffered reasons for imposing the challenged conditions. At least two potential justifications seem relevant for inquiry here: (1) public safety; and (2) benign discrimination.[19] However, first we address the district court's use of the rational relationship test to review Orem's challenged actions.

The district court analyzed Orem's actions pursuant to the rational relationship test borrowed from Equal Protection Clause jurisprudence, and the court stated that the challenged restrictions should be upheld if "rationally related to a legitimate governmental purpose." *Bangerter*, 797 F.Supp. at 922 (quoting *Familystyle*, 923 F.2d at 94). The district court relied principally on the Eighth Circuit's decision in *Familystyle*, which held that government policies that discriminate against the handicapped should not receive heightened scrutiny because the handicapped are not a "suspect class." 923 F.2d at 94 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257–58, 87 L.Ed.2d 313 (1975)). However, the use of an Equal Protection analysis is misplaced here because this case involves a federal statute and not the Fourteenth Amendment. As the Tenth Circuit has said, a plaintiff's "inability to properly assert a right under the Fourteenth Amendment is not of concern when examining [the plaintiff's] claims brought pursuant to the Fair Housing Act." *Ponca City*, 952 F.2d at 1193. Moreover, the FHAA specifically makes the handicapped a protected class for purposes of a statutory claim—they are the direct object of the statutory protection—even if they are not a protected class for constitutional purposes.[20]

The proper approach is to look to the language of the FHAA itself, and to the manner in which analogous provisions of Title VII have been interpreted, in order to determine what justifications are available to sustain intentional discrimination against the handicapped. First, the FHAA expressly allows discrimination rooted in public safety concerns when it provides that "[n]othing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). We read section 3604(f)(9) as permitting reasonable restrictions on the terms or conditions of housing when justified by public safety concerns, given that housing can be denied altogether for those same reasons. However, the exceptions to the FHAA's prohibitions on discrimination should be narrowly construed. *Elliott v. City of Athens, Ga.*, 960 F.2d 975, 978–79 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992).

Restrictions predicated on public safety cannot be based on blanket stereotypes about the handicapped, but must be tailored to particularized concerns about individual residents. As the FHAA's legislative history declares, the FHAA "repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." H.R.Rep. No. 100–711 at 18, 1988 U.S.Code Cong. & Admin.News at p. 2179. Any special requirements placed on housing for the handicapped based on concerns for the protection of the disabled themselves or the community must be "individualiz[ed] ... to

---

19. Because of the preliminary record, we do not preclude the possibility that additional justifications for Orem's actions might be developed once evidence is taken. Further, as observed previously, this action does not present any challenge to the criteria established for group homes for the disabled by the Utah Department of Social Services, and thus we do not address that matter in this opinion.

20. Moreover, even if this case had been brought as an equal protection claim, there is no evidence that the zoning restrictions were rationally related to legitimate government concerns and not based on unsubstantiated fears or irrational prejudices. *Cleburne*, 473 U.S. at 448–49, 105 S.Ct. at 3258–59. Under the analysis in *Cleburne*, Orem would fail the rational relationship test on this state of the record even if an equal protection analysis were used.

the needs or abilities of particular kinds of developmental disabilities," *Mabrunak, Inc. v. City of Stow, Ohio,* 974 F.2d 43, 47 (6th Cir.1992), and must have a "necessary correlation to the actual abilities of the persons upon whom it is imposed," *Potomac Group Home,* 823 F.Supp. at 1300.

 Here, there is no showing that the Orem restrictions were individualized to the residents of the RLO–Chrysalis home. For example, there is no evidence or pleadings here to support a conclusion that the residents of this particular home were so mentally disabled that they needed 24–hour supervision or that they had any tendencies that would support the need for a neighborhood advisory committee.[21] However, on remand the court should explore the public safety aspect of these requirements. For example, the supervision requirement was simply that the operator had to ensure Orem that the residents were "properly supervised on a twenty-four hour basis." We cannot tell on this record whether that required on-site supervision the entire time, or whether off-site supervision might have been used to some extent, and we cannot tell the nature of the supervision or how oppressive or benign it might have been. Thus, we cannot determine whether this restriction could be justified under § 3604(f)(9) without more facts in this record.

 Second, the FHAA should not be interpreted to preclude special restrictions upon the disabled that are really beneficial to, rather than discriminatory against, the handicapped.[22] In this regard we are guided by employment discrimination cases and Title VII jurisprudence to inform our reading of the Fair Housing Act. *Honce,* 1 F.3d at 1088; *Morgan v. HUD,* 985 F.2d 1451, 1456 n. 4 (10th Cir.1993); *Huntington Branch, NAACP,* 844 F.2d at 934–35.

In the employment discrimination context, the Supreme Court has held that Title VII's bar on all discrimination on the basis of race should not be read literally. *United Steelworkers of America, AFL–CIO–CLC v. Web-er,* 443 U.S. 193, 201–08, 99 S.Ct. 2721, 2726–30, 61 L.Ed.2d 480 (1979). Instead, the statute should be interpreted "against the background of the legislative history of Title VII and the historical context from which the Act arose," *id.* at 201, 99 S.Ct. at 2726, and should not be construed to prohibit race-conscious affirmative action that promotes "the ultimate statutory goals" of expanding employment opportunities for minorities, *id.* at 203, 207, 99 S.Ct. at 2727, 2729.

The underlying objective of the FHAA is to "extend[ ] the principle of equal housing opportunity to handicapped persons," H.R.Rep. No. 100–711 at 13, 1988 U.S.Code Cong. & Admin.News at p. 2174, and end discrimination against the handicapped in the provision of housing based on prejudice, stereotypes, and ignorance, *id.* at 18, 1988 U.S.Code Cong. & Admin.News at p. 2179. Removing discrimination in housing promotes "the goal of independent living" and is part of Congress's larger "commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." *Id.*

 We should be chary about accepting the justification that a particular restriction upon the handicapped really advances their housing opportunities rather than discriminates against them in housing. Restrictions that are based upon unsupported stereotypes or upon prejudice and fear stemming from ignorance or generalizations, for example, would not pass muster. However, restrictions that are narrowly tailored to the particular individuals affected could be acceptable under the FHAA if the benefit to the handicapped in their housing opportunities clearly outweigh whatever burden may result to them. In the context of facially neutral government actions that have a discriminatory impact on the handicapped or other groups protected by the Fair Housing Act, courts have uniformly allowed defendants to justify their conduct despite the discriminatory impact if they can prove that they "furthered, in theory and in practice, a legitimate, bona

---

**21.** We do note, however, that one individual in the RLO–Chrysalis home had been previously incarcerated for a notorious crime in Orem.

**22.** Section 3604(f)(2), for example, only makes it illegal "to discriminate *against* any [handicapped persons]." (emphasis added).

fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch, NAACP,* 844 F.2d at 936 (citing *Resident Advisory Bd.,* 564 F.2d at 148–49).

A similar approach has been suggested in the context of intentional race-based discrimination under the FHAA. For example, in *South–Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors,* the Seventh Circuit upheld selective marketing activities designed to interest white buyers in purchasing houses in traditionally black neighborhoods, even though such efforts of necessity diminished the likelihood that such homes would be available for black buyers. 935 F.2d 868, 882–84 (7th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992). In *Otero v. New York City Hous. Auth.,* the Second Circuit allowed a housing authority to seek to justify under Title VIII a change in leasing policy in order to facilitate white participation in a housing project that was otherwise faced with the prospect of becoming predominantly black and segregated. 484 F.2d 1122, 1134 (2d Cir.1973) ("Congress' desire in providing fair housing throughout the United States was ... to promote open, integrated housing, even though the effect in some instances might be to prevent some members of a racial minority from residing in publicly assisted housing in a particular location."). Even those courts that have invalidated particular race-conscious policies have left some room for other policies that restrict minorities in limited ways in order to foster integration and the overarching policies of the Fair Housing Act. In *United States v. Starrett City Assocs.,* for example, the Second Circuit acknowledged that race-conscious plans burdening a minority might be upheld if they are temporary, flexible in nature, and designed ultimately to achieve the FHAA's goal of integration. 840 F.2d 1096, 1101–03 (2d Cir.1988), *cert. denied,* 488

U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988). Similarly, in *United States v. Charlottesville Redev. and Hous. Auth.,* the court explained that "[a] race-conscious preferential policy could survive legal scrutiny if it is narrowly tailored, remedial in character, and temporary in duration." 718 F.Supp. 461, 469 (W.D.Va.1989).

These courts all recognize the importance of leaving room for flexible solutions to address the complex problem of discrimination and to realize the goals established by Congress in the Fair Housing Act. However, once again, such an analysis cannot be performed on the pleadings alone. For example, with regard to the neighborhood advisory committee, it would be helpful for the court to explore how such a committee operated, what burdens it imposed upon the handicapped residents of the RLO–Chrysalis home, what benefits such a committee provided to the handicapped residents, and what the motivations and intentions were of the City of Orem in imposing such a restriction.[23] It could be that the evidence will show that such a neighborhood advisory committee might prove to be beneficial to the handicapped, increasing their access to, and acceptability in, the neighborhood.[24] Only after a record has been developed can the district court, and ultimately our Court, determine whether these restrictions violate of the FHAA.

## III. *CONCLUSION*

For the reasons explained above, we RE-VERSE and REMAND to the district court for further proceedings consistent with this opinion.

---

**23.** We do not suggest that Bangerter must prove that Orem acted with bad animus to make out a case of intentional discrimination. Nevertheless, a limited inquiry into Orem's intentions might shed light on whether the justifications offered for its actions are bona fide.

**24.** We note that the Utah statute under which Orem's ordinance is authorized does attempt to guide municipalities and limit regulation of hous-

ing for the handicapped. The statute affirmatively prohibits basing zoning decisions regarding housing for the handicapped on illegitimate criteria. Utah Code Ann. § 10–9–2.5(4). It also applies only to those persons who need special services or assistance "to allow the person to function in and contribute to, a residential neighborhood." Utah Code Ann. § 10–9–2.5(1)(a).