CALLAHAN, Circuit Judge
concurring and dissenting.
I agree with much of the majority opinion; however, on three important points we part company.[1] First, while I agree with the majority that the district court should have applied the test set forth in Int’l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc., 499 U.S. 187, 200-01, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), I read the record as including evidence that the temporary dislocation of homeless women was necessary for safety concerns and for the long-term increase in the facilities available to homeless women. Second, even if there is some question as to whether the overall scheme constituted a “bona fide occupational qualification” under Johnson Controls, id. at 200, 111 S.Ct. 1196, the appropriate remedy is to vacate the district court’s order and remand for further proceedings. Third, although the majority correctly identifies the critical issue on appellants’ Establishment Clause claim, its conclusion that the Boise Rescue Mission Ministries’ voluntary chapel services constitute religious indoctrination attributable to the government is neither factually nor legally sound.
I
My analysis starts with the same factual determination as the majority: the men-only policy at Community House is facially discriminatory because it explicitly treats women and families different from men. Furthermore, we agree that the district court erred in applying the test set forth in McDonnell Douglas Corp. v. Green, 411 *1061 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and should have applied the approach adopted in Johnson Controls, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158. In Johnson Controls, the Supreme Court held that discrimination based on gender was forbidden under Title VII “unless respondent can establish that sex is a ‘bona fide occupational qualification.’ ” (“BFOQ”) Id. at 200, 111 S.Ct. 1196.
I also agree with the majority that in examining discrimination issues under the Fair Housing Act, we have frequently drawn from employment discrimination analysis (see maj. op. 1048 n. 3), and importantly, that we “have not previously adopted a standard for determining the propriety or acceptability of justifications for facial discrimination under the Fair Housing Act.” (maj. op. 1050) I appreciate the majority’s recognition of a split between our sister circuits as to the standard to be applied for analyzing a defendant’s rationales in challenges under the Fair Housing Act as it applies to claims under the Equal Protection Clause. I do not object to the majority’s adoption of the approach adopted by the Sixth and Tenth Circuits in requiring that a restriction be based on legitimate public concerns, rather than stereotypes, and benefits the protected class. See Larkin v. Michigan Dep’t of Social Servs., 89 F.3d 285, 290 (6th Cir.1996), and Bangerter v. Orem City Corp., 46 F.3d 1491, 1503-04 (10th Cir.1995). Nonetheless, applying this more exacting test, appellants have not demonstrated that they are entitled to injunctive relief.
The City proffered two justifications for the men-only policy at Community House: (1) safety concerns, and (2) transferring men to Community House would allow Boise Rescue Mission Ministries (“BRM”) to convert another one of its facilities into a shelter for women and children. The safety concerns are the type of legitimate interests, not based on stereotypes, that may satisfy the first prong of the test for allowing a facially discriminatory provision. Indeed, the majority recognizes that safety concerns might justify the men-only policy. (See maj. op. 1051) I would affirm as I agree with the district court that “the record contains evidence supporting the safety problems inherent in housing homeless men with homeless women.” Moreover, even if I were to determine that safety concerns were not adequately addressed on this record, I would remand the matter to the district court to take additional evidence.[2]
The City addressed the second prong of the test by offering evidence that the men-only policy at Community House was only a temporary disadvantage necessary to allow the conversion of the nearby Boise Rescue Mission into increased shelter space for women and children. In Ban-gerter, the Tenth Circuit observed that “courts have uniformly allowed defendants to justify their conduct despite the discriminatory impact if they can prove that they ‘furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect’ ” and noted that a similar approach had been suggested for certain intentional discrimination claims under the Fair Housing *1062 Act. 46 F.3d at 1504-05 (internal citations omitted).
Here, the district court held:
It appears to the court that with the lease, the city seized the opportunity to (1) turn over operations of Community House to an expert; (2) immediately increase the space for homeless men; and (3) eventually increase the space for homeless women and children. In other words, the City made the political decision to trade short-term hardship for long-term gain.
If the Court were to intervene, it would simply transfer the hardship from one class of homeless women to another. By ordering the return of former female residents to Community House, the Court would scuttle any deal for increased space at the Boise Rescue Mission and shift the hardship to the women who would have occupied that space. This case is about scarce resources, not discrimination.
I would hold that the district court’s reasoning supports a determination that the men-only policy at the Community House was in effect a “BFOQ” intended to result in additional and better shelters for women and children.[3] We should not be so shortsighted as to not recognize that improving the housing for certain groups of people may require some short-term disadvantages.
It is not clear whether the majority disagrees with the proposition that the long-term benefits may justify short-term disadvantages. It seems to question the factual premise of the district court’s determination, rather than its legal analysis. The majority cites BRM’s reticence, prior to the approval of its bid for Community House, to commit to the conversion of the Boise Rescue Mission. The district court, however, found that “BRM made that commitment in its proposal to the City, and there is no evidence that the BRM intends not to honor its commitment.”
I would hold that although the district court erred in applying the McDonnell Douglas standard instead of the Johnson Controls approach, the error was harmless because the City presented evidence that fairly supports the district court’s determination that the men-only policy was part of a program designed to increase the homeless shelter available to women and children, and this determination is entitled to deference. Nat’l Wildlife Federation v. Nat’l Marine Fisheries Serv., 422 F.3d 782, 793 (9th Cir.2005) (“A district court’s order with respect to preliminary injunc-tive relief is subject to limited appellate review, and we will reverse only if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.” (internal quotation marks and citation omitted)).
II
Moreover, if the district court’s error is not harmless, the proper remedy is not the issuance of injunctive relief, but the vacation of the district court’s denial of the preliminary injunction and a remand to allow the district court to develop the underlying facts and to apply circuit law as articulated in this opinion. In the penultimate paragraph in its opinion in Bangerter, the Tenth Circuit wrote:
These courts all recognize the importance of leaving room for flexible solutions to address the complex problem of discrimination and to realize the goals
*1063 established by Congress in the Fair Housing Act.
However, once again, such an analysis cannot be performed on the pleadings alone.
It could be that the evidence will show that such a neighborhood advisory committee might prove to be beneficial to the handicapped, increasing their access to, and acceptability in, the neighborhood. Only after a record has been developed can the district court, and ultimately our Court, determine whether these restrictions violate the FHAA.
46 F.3d at 1505 (footnotes omitted). These concerns recommend that we stay our hand and remand this case to allow for further development of the evidence.
The majority, however, charges into the fray, despite recognizing that the applicable law and relevant facts are less than clear, and without citing any authority for its activism. Indeed, the single case cited by the majority for the “requirements for a preliminary injunction,” Warsoldier v. Woodford, 418 F.3d 989 (9th Cir.2005), concludes by reversing and remanding “for further proceedings not inconsistent with this opinion.” Id. at 1002. In light of the majority’s enunciation of a standard that admittedly was not clear when the district court acted and the inevitable effects of the passage of time, the proper form of relief — were relief warranted — is a vacation of the district court’s denial of in-junctive relief and a remand for further proceedings consistent with this court’s opinion.
Ill
Again, I start at the same place as the majority on appellants’ Establishment Clause claim, but cannot agree that appellants have demonstrated that they are entitled to affirmative action from this court or the district court. We agree that the appropriate test is that set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-23, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and modified by Agostini v. Felton, 521 U.S. 203, 222-23, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). See also Mitchell v. Helms, 530 U.S. 793, 807-08, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (Thomas, J., plurality) and Mitchell, 530 U.S. at 844-45, 120 S.Ct. 2530 (O’Connor, J., concurring).
As noted by Justice O’Connor in her concurring opinion in Mitchell, following Agostini, the Court has
articulated three primary criteria to guide the determination whether a government-aid program impermissibly advances religion: (1) whether the aid results in governmental indoctrination, (2) whether the aid program defines its recipients by reference to religion, and (3) whether the aid creates an excessive entanglement between government and religion.
530 U.S. at 845, 120 S.Ct. 2530. Here, we agree that the appellants have not shown that serious questions exist regarding excessive entanglement (see maj. op. 1056), and it appears that neither the City in its lease, nor the BRM in managing the shelter, “defines the recipients by reference to religion.” Thus, for there to be any violation of the Establishment Clause there must be “governmental indoctrination.”
The majority reasons that “governmental indoctrination” has two components: (1) that BRM’s activities at Community House constitute or result in indoctrination, and (2) that such indoctrination is attributable to the government. (See maj. op. 1056, citing DeStefano v. Emergency Hous. Group, Inc., 247 F.3d 397, 414 (2d Cir.2001)). For the purposes of this dissent, I accept the majority’s determination that BRM’s holding of chapel services constitutes “indoctrination.” The majority, however, fails to appreciate the Supreme *1064 Court’s opinions in Agostini and Mitchell when it concludes that this “indoctrination” is attributable to the City.
The majority’s conclusion is based on its finding that “it appears that the aid from the City (i.e. the Community House facility) is actually being diverted for Christian chapel services in addition to other services for the homeless.” (maj. op. 1059) This finding is factually suspect and employs disapproved legal analysis.
On the existing record, it is questionable whether there is any “aid” flowing from the city to the BRM. What is known is that the BRM pays the City a dollar a year. The BRM has a five-year lease, and the City insures the premises and pays for necessary repairs. The majority also notes that the BRM has a 20-month option to buy the property for two million dollars, which is $500,000 less than the minimum value that the City established for the property in July 2005. But, there is no suggestion that the BRM’s bid was not the best bid that the City received. Also, as the majority notes, the City’s prior lease with a secular organization was even more favorable to the lessee. Furthermore, it appears that Community House was constructed with federal funds and that this restricts what the City can do with Community House. In addition, the record reflects that the BRM is a Christian nonprofit organization that serves the homeless population in Boise. There is nothing in the record to suggest that the lease of Community House somehow enriches the BRM. Rather, it appears that the lease allows the BRM to provide homeless shelters that otherwise would have to be furnished (and paid for) by the City or simply would not exist. Perhaps a record could be developed to show that the lease constitutes “aid” from the City to the BRM, but the present record neither compels, nor supports, such a factual determination.
The majority’s conclusion is also based on a concept of diversion that was strongly rejected in Mitchell both by Justice Thomas in his plurality opinion and by Justice O’Connor in her concurring opinion. The majority’s reasoning appears to be that whatever “aid” flows from the City to the BRM by way of the lease is “diverted” from the secular purpose of the lease— providing shelter — to the religious purpose of holding non-mandatory chapel services. This is out of step with the plurality and concurring opinions in Mitchell.
The situation at bar does not constitute governmental indoctrination under Justice Thomas’s plurality opinion in Mitchell. Although Mitchell concerned a distinct issue, aid to private religious schools, the impact of the plurality’s position on this case is clear. Justice Thomas wrote:
In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion. If the religious, irreligious, and a religious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. For attribution of indoctrination is a relative question. If the government is offering assistance to recipients who provide, so to speak, a broad range of indoctrination, the government itself is not thought responsible for any particular indoctrination.
530 U.S. at 809-10, 120 S.Ct. 2530. In our case, the City, pursuant to a request for proposals, determined that the BRM could best meet its secular purpose of providing shelter to the homeless. Under the plurality’s approach, the incidental holding of voluntary chapel services for the homeless *1065 does not rise to the level of governmental indoctrination. Justice Thomas recognized that the aid in issue in Mitchell could indirectly benefit the religion that operated the school, but held that this could not reasonably be viewed as an endorsement of religion.[4] Id. at 835, 120 S.Ct. 2530. Justice Thomas’s plurality opinion should be read in conjunction with Justice O’Con-nor’s concurring opinion. The majority here focuses on Justice O’Connor’s statement that the Court has “never held that a government-aid program passes constitutional muster solely because of the neutral criteria it employs as a basis for distributing aid.” Mitchell, 530 U.S. at 839, 120 S.Ct. 2530 (emphasis in original), and her objection to the “actual diversion of government aid to religious indoctrination.” (maj. op. 1058) This misses the critical distinction between Justice O’Connor’s concurring opinion and Justice Souter’s dissent. Justice O’Connor, joined by Justice Breyer, held that the aid in issue in Mitchell did not result in governmental indoctrination, even though it obviously had some indirect benefit to the religion that ran the school. Similarly, even assuming that some aid flows from the City to the BRM, under Justice O’Connor’s concurring opinion in Mitchell, this does not amount to government indoctrination.
Justice O’Connor observed that in recent years the Court “had taken a more forgiving view of neutral government programs that make aid available generally without regard to the religious or nonreligious character of the recipient.” Mitchell, 530 U.S. at 847, 120 S.Ct. 2530, citing Agostini, 521 U.S. at 225-26, 117 S.Ct. 1997. In addition, she, like the plurality, recognized that almost any aid could be diverted.[5] To meet these realities, Justice O’Connor proposed that to “establish a *1066 First Amendment violation, plaintiffs must prove that the aid in question actually is, or has been, used for religious purposes.” Id. at 857, 120 S.Ct. 2530. However, she would reject any presumption that secular restrictions were not followed. Id. at 859, 120 S.Ct. 2530. Justice O’Connor also indicated that a de minimis diversion would not raise constitutional concerns.[6] Id. at 861, 120 S.Ct. 2530.
In our case, any aid flowing from the City to the BRM is truly de minimis. The BRM has agreed to undertake the not inconsiderable expense of maintaining a homeless shelter, in return for the City insuring the premises and paying for necessary repairs.[7] As it does not appear that the BRM receives any funds from the City, there is no possibility of any actual diversion of money. Accordingly, the majority ventures into the relatively unchart-ered waters of determining when intangible assistance from a governmental entity amounts to “governmental indoctrination.” I would not embark on this course because, here, conducting chapel services at which attendance is voluntary, in conjunction with generally providing homeless services, simply does not rise to a level of constitutional concern.
Finally, even if it were determined that holding voluntary chapel services could amount to government indoctrination, the proper course, as previously explained (see Part II), would be to vacate the district court’s denial of injunctive relief, and to remand to allow the parties to present the factual evidence necessary for even a preliminary determination that the BRM’s holding of voluntary chapel services might amount to government indoctrination.
IV
In sum, I would affirm the district court’s denial of a preliminary injunction. Although the district court erred in failing to apply the test set forth in Johnson Controls, 499 U.S. at 200-01, 111 S.Ct. 1196, this was harmless error because the record shows that the City offered two bona fide government interests to sustain the lease. In addition, this record contains no showing of the “governmental indoctrination” necessary for judicial relief from an alleged violation of the Establishment Clause under the Supreme Court’s opinions in Agostini, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391, and Mitchell, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660. Lastly, even if the district court had erred in denying the appellants preliminary relief, the proper remedy would be a remand for further proceedings consistent with our opinion.

. I concur in the majority's affirmance of the district court’s denial of relief on appellants' disability discrimination claims and the decision to decline to consider the appellants' claim under the Idaho Constitution.

. The district court noted that Community House contained both a homeless shelter and a low-cost housing unit. The homeless shelter could hold in separate dorms, 66 men and 13 women. There were ten units for homeless families and another ten units for low income, or "transitional,” housing as well as 39 single-residence apartments. Community House had accommodations for the disabled, and about three-fourths of its residents were disabled. This mix of homeless single adults, families with children, and the disabled (mentally and physically) would appear to be a volatile mix.

. I recognize that while the concept of a “BFOQ” may be borrowed from employment discrimination cases, the exact contours of a bona fide government interest in litigation under the Fair Housing Act may have to be altered to reflect certain differences between housing and employment.

. Justice Thomas explained:
A concern for divertibility, as opposed to improper content, is misplaced not only because it fails to explain why the sort of aid that we have allowed is permissible, but also because it is boundless — enveloping all aid, no matter how trivial — and thus has only the most attenuated (if any) link to any realistic concern for preventing an "establishment of religion.” Presumably, for example, government-provided lecterns, chalk, crayons, pens, paper, and paintbrushes would have to be excluded from religious schools under respondents’ proposed rule. But we fail to see how indoctrination by means of (i.e., diversion of) such aid could be attributed to the government.
Id. at 824, 120 S.Ct. 2530. Similarly, in this case, it is doubtful whether — as a matter of law — the supposed diversion of "aid” to the BRM’s chapel services could be attributed to the City.

. Justice O’Connor observed:
An educator can use virtually any instructional tool, whether it has ascertainable content or not, to teach a religious message. In this respect, I agree with the plurality that "it is hard to imagine any book that could not, in even moderately skilled hands, serve to illustrate a religious message.” Ante, at 2549. In today’s case, for example, we are asked to draw a constitutional distinction between lending a textbook and lending a library book. Justice SOUTER's try at justifying that distinction only demonstrates the absurdity on which such a difference must rest. He states that "[ajlthough library books, like textbooks, have fixed content, religious teachers can assign secular library books for religious critique.” Post, at 2592. Regardless of whether that explanation is even correct (for a student surely could be given a religious assignment in connection with a textbook too), it is hardly a distinction on which constitutional law should turn. Moreover, if the mere ability of a teacher to devise a religious lesson involving the secular aid in question suffices to hold the provision of that aid unconstitutional, it is difficult to discern any limiting principle to the divertibility rule. For example, even a publicly financed lunch would apparently be unconstitutional under a divertibility rationale because religious school officials conceivably could use the lunch to lead the students in a blessing over the bread.
Id. at 855, 120 S.Ct. 2530.

. Justice O’Connor wrote: "[t]he limited evidence amassed by respondents during 4 years of discovery (which began approximately 15 years ago) is at best de minimis and therefore insufficient to affect the constitutional inquiry.” Id. at 861, 120 S.Ct. 2530.

. The City may well have these obligations regardless of the identity of the lessee, or whether the building is leased.