**EPICENTER OF STEUBENVILLE, INC., Plaintiff,**

v.

**CITY OF STEUBENVILLE, Defendant.**

No. C–2–96–0025.

United States District Court, S.D. Ohio, Eastern Division.

April 30, 1996.

Michael Harvey Gertner, Columbus, OH, Mark S. Colucci, Youngstown, OH, for plaintiff.

Steven Forbes, Janik & Dunn, Cleveland, OH, for defendant.

## OPINION & ORDER

KINNEARY, District Judge.

This case involves a municipal act of willful discrimination carried out in direct contravention of federal law. The question raised by the parties is whether the city of Steubenville may enact and enforce an absolute, one-year moratorium on the establishment of any and all new "Adult Care Facilities"—a species of group housing for the handicapped—to address the alleged problems created by the presence, acts and lack of supervision of a discrete number of mentally disabled residents living in existing Adult Care Facilities operated by one housing provider, Epicenter of Steubenville Incorporated. The answer is a resounding no.

## I. FACTS

In 1987, Epicenter was formed as a for-profit corporation in the business of providing group housing for the mentally impaired. The group homes built and operated by Epicenter fell into a class of group homes known as "Adult Care Facilities." An Adult Care Facility is a group home that provides accommodations and supervision to three to sixteen unrelated adults, at least three of whom require personal care services. Ohio Rev.Code Ann. § 3722.01(A)(9) (Anderson 1992). "Personal care services" include the following: 1) assisting residents with activities of daily living; 2) assisting residents with the self-administration of medication; and 3) assisting residents with the preparation of special diets. *Id.* at § 3722.01(A)(6). In essence, these facilities house handicapped individuals who can live with a limited degree of independence but who are unable to live completely independent lives due to their disability. *See* 42 U.S.C. § 3602(h) (defining "handicap" to include persons with a physical or mental impairment which substantially limits one or more of such person's daily life activities).

Steubenville is the ideal spot for Epicenter to establish Adult Care Facilities; the city contains an abundance of affordable housing.[1] Accordingly, Epicenter has opened and now operates six "Adult Care Facilities" for the mentally handicapped, five of which are located within a few square blocks of one another in the "North End" of Steubenville—an area that provides convenient access to museums, businesses, parks, and government services. To make these old houses both suitable and comfortable for the handicapped residents, Epicenter has spent $600,000 refurbishing them.

Each of Epicenter's Adult Care Facilities has the capacity to house sixteen people, and historically the houses have operated between 80% to 95% capacity. Most of the residents of the facilities are natives of the various counties in Eastern Ohio, but some originate from outside the area and outside the State of Ohio. They all have been diagnosed with mental disabilities, such as bipolar disorders, schizophrenia, "blinders," and "organic brain syndrome."

The State of Ohio guarantees residents of Adult Care Facilities certain rights that the non-handicapped take for granted. These statutorily protected rights include the following: the right to be free from physical restraints; the right not to be deprived of any legal rights solely by reason of their residence in an Adult Care Facility; and the right to initiate and maintain contact with the local community. *See* Ohio Rev.Code Ann. § 3722.12 (Anderson Supp.1995). Thus, the residents of the Epicenter facilities can come and go as they please.

These rights, however, do not eliminate the need nor the requirement that operators of Adult Care Facilities provide supervision and assistance to the residents of each Adult Care Facility. Epicenter has consistently met these obligations. Each facility has two to five employees on duty at all times. Those employees, with a few exceptions, have operated the homes in compliance with the State of Ohio's health and safety laws and regulations, and, where violations have occurred, Epicenter has always achieved 100% compliance within the statutorily granted window of opportunity to correct the viola-

---

1. For example, one citizen testified at a City Council hearing that a house in the North End was recently selling for only $9,000.

tions. *See* Ohio Rev.Code Ann. § 3722.06 (Anderson 1992).

Epicenter would now like to open a seventh Adult Care Facility in Steubenville, to be located in the North End. To open the new Adult Care Facility, however, Epicenter must obtain a license to operate from the State of Ohio, Ohio Rev.Code § 3722.02 (Anderson Supp.1995), which requires the local building and fire departments to inspect and approve the proposed facility. *See Id.* § 3722.02(A) (Anderson Supp.1995) (facility must be inspected and approved by a "local certified building department ... [and] inspected by the state fire marshal or fire prevention officer of a municipal ... fire department").

Epicenter attempted to obtain the necessary inspection and approvals by the local authorities, but Steubenville's City Manager has blocked the inspections because of the City Council's enactment of a one-year moratorium on the establishment of all new Adult Care Facilities within city limits. Ordinance 1995-88, on which the City Manager relies, reads as follows:

WHEREAS, City Council held a public hearing on Tuesday, September 12, 1995 and heard approximately two (2) hours of testimony concerning residents of Adult Care Facilities situated in the North End of the City; and

WHEREAS, the above-mentioned testimony revealed a serious lack of care and supervision of adult residents of Adult Care Facilities located in the North End of the City; and

WHEREAS, this lack of care and supervision affects the health, safety and welfare of adult residents of Adult Care Facilities as well as the health, safety and welfare of other residents of the City.

NOW, THEREFORE, BE IT ORDAINED BY THE COUNCIL OF THE CITY OF STEUBENVILLE, COUNTY OF JEFFERSON, STATE OF OHIO:

SECTION 1: That this Council does hereby place a one (1) Year moratorium on the establishment of any new Adult Care Facility in the City of Steubenville.

SECTION 2: That this Ordinance is hereby declared to be an emergency Ordinance necessary for the preservation of the public health, safety, and welfare of the citizens of the City of Steubenville, Ohio, and for the further reason that this moratorium should be established immediately so that the State Director of Health can investigate these reported instances of lack of care and supervision immediately before any new Adult Care Facilities are established; and as a result thereof, this Ordinance shall take effect and be in full force immediately upon its passage by Council; otherwise at the earliest period allowed by law.

(Joint Exh. F) (emphasis in original).

Epicenter is now before the Court protesting Ordinance 1995-88 on the ground that it violates the Fair Housing Act, as amended in 1988 ("FHAA"), because it constitutes intentional and unjustified discrimination against the handicapped. *See* 42 U.S.C. §§ 3601, *et seq.* On March 26, 1996, after a preliminary injunction hearing, this Court enjoined Steubenville from enforcing the moratorium. This Opinion & Order fully explains the reasons for the issuance of the injunction and the scope of the injunction.

## II.

"When presented with a motion for a preliminary injunction, a district court considers four factors: 1) the plaintiffs' likelihood of success on the merits, 2) whether the plaintiffs could suffer irreparable harm without the injunction, 3) whether granting the injunction will cause substantial harm to others, and 4) the impact of the injunction on the public interest." *Golden v. Kelsey-Hayes Co.,* 73 F.3d 648, 653 (6th Cir.1996) (citing *Performance Unlimited Inc. v. Questar Publishers Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995)). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Id.*

### A. Likelihood of Success on the Merits

Tragically, this country has a long history of kennelling the mentally ill in "massive custodial institutions" where they have been abused and neglected. *City of Cleburne,*

*Tex. v. Cleburne Living Center,* 473 U.S. 432, 462, 105 S.Ct. 3249, 3266, 87 L.Ed.2d 313 (1985). Beginning in the 1960's, however, a nationwide movement toward deinstitutionalization developed—based on the premise that the mentally ill, like all other individuals, have differing abilities and disabilities and that each will achieve his or her greatest potential in the community setting. Cities such as Steubenville, however, reacted to the deinstitutionalization movement in a manner similar to that of the postbellum Southern state governments that passed Jim Crow laws; they enacted restrictive zoning ordinances that precluded assimilation by the handicapped. Realtors further frustrated the mainstreaming of the mentally ill by steering the disabled and the housing providers for the disabled to ghetto areas. In essence, the discriminators recognized the importance of a good community and its effect on a person's opportunity for work, education, and a safe environment, but they selfishly chose to deprive some of the most helpless in our society, the handicapped, of those opportunities.

■ Congress, recognizing the ills of discrimination against the handicapped, passed the FHAA to prohibit discrimination against handicapped individuals in the provision of housing. 42 U.S.C. § 3601, *et seq.; see Marbrunak, Inc. v. City of Stow, Ohio,* 974 F.2d 43, 45 (6th Cir.1992) (holding that the FHAA applies to municipalities); 1988 U.S.Code Cong. & Admin.News at 2179 ("[The act] is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream"). This act is thought to be "a major step in changing the stereotypes that have served to exclude [the handicapped] from American life." *Id.* Thus, to fully effectuate Congress' remedial purpose, courts must give the FHAA a broad interpretation. *Potomac Group Home Corp. v. Montgomery County, Md.,* 823 F.Supp. 1285, 1294 (D.Md. 1993) (citing *A.F.A.P.S v. Regulations & Permits Admin.,* 740 F.Supp. 95, 102, 106 (D.Puerto Rico 1990) and *Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 731 (S.D.Ill. 1989)).

### 1. STANDING

Because members of the handicapped community rarely have the resources necessary to protect their interests, discriminators often act intentionally and with impunity when passing discriminatory zoning laws. Recognizing this powerlessness of the handicapped, Congress granted the right to sue under the statute to a broad group of persons so as to ensure that the FHAA would be enforced. Under the statute, any "aggrieved person" may sue to enforce its provisions. 42 U.S.C. 3613(a)(1)(A). "Aggrieved persons" are those that "claim[ ] to have been injured by a discriminatory housing practice." *Id.* at 3602(i). The grant of standing extends to

> the full limits of [Article III of the United States Constitution].... Thus the sole requirement for standing to sue under the [FHAA] is ... injury in fact: that the plaintiff allege as a result of the defendant's action he has suffered a "distinct and palpable injury."

*Havens Realty Corp v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (citations omitted).

■ By extending the grant of standing to those who have suffered an "injury in fact," Congress granted standing to housing providers who have been frustrated by discriminatory housing practices. *See Marbrunak,* 974 F.2d at 47 (suit by "family consortium" designed to provide housing for handicapped); *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1281–82 (3d Cir.1993) (provider of "Community Living Arrangements" has standing); *Potomac Group Home,* 823 F.Supp. at 1285 (suit by operator of group home); *Horizon House v. Township of Upper Southampton,* 804 F.Supp. 683, 691–93 (E.D.Pa.1992) (corporation providing residential services to handicapped has standing); *Support Ministries v. Village of Waterford, N.Y.,* 808 F.Supp. 120 (N.D.N.Y.1992) (suit brought by property owner denied the right to open a group home for the handicapped); *Stewart B. McKinney v. Town Plan and Zoning Comm'n,* 790 F.Supp. 1197 (D.Conn.1992) (suit by non-profit provider of shelter and assistance to seriously ill); *Baxter,* 720 F.Supp. at 727–730 (real estate developer

has standing).[2] As a result, Epicenter has standing to bring this suit because it alleges an injury in fact. Epicenter alleges that Steubenville enacted and enforced a discriminatory zoning ordinance and that, as a result of Steubenville's acts, it has been unable to obtain a permit for, and thus unable to open, its seventh Adult Care Facility.

### 2. THE FHAA

Epicenter demonstrates an overwhelming likelihood of success on the merits of its claim under the FHAA because the evidence shows that Ordinance 1995–88 is facially invalid. First, the ordinance unmistakenly discriminates against the handicapped, and second, it does so for an impermissible purpose.

#### a. Steubenville's Discrimination

■ Discrimination may be proved by one of two means. See Bangerter v. Orem City Corp., 46 F.3d 1491, 1501 (10th Cir.1995); Baxter, 720 F.Supp. at 732; A.F.A.P.S v. Regulations & Permits Admin., 740 F.Supp. at 103, 106. The first method, known as a "disparate treatment" analysis, probes into whether the evidence shows a discriminatory intent. The second method, known as a "disparate impact" analysis, examines whether the effect of a defendant's action is unnecessarily discriminatory even though no intent to discriminate is proved.

■ Due to the obviousness of the discrimination in this case, the evidence requires very little analysis to conclude that Steubenville passed the moratorium to discriminate against the mentally handicapped. For purposes of clarity, however, the Court classifies this as a classic case of discriminatory treatment because Epicenter alleges and has proved that the ordinance was passed with the intent to discriminate against the mentally impaired residents who presently reside in the existing Adult Care Facilities operated by Epicenter and those who would reside in future Adult Care Facilities run by Epicenter.

The discriminatory intent and purpose of the ordinance is apparent on the face of the act. See Bangerter, 46 F.3d at 1500 & n. 16 (intent to discriminate on face of statute). It singles out, for adverse treatment, Adult Care Facilities—a type of handicapped housing; it does not prohibit the establishment of any other housing. Moreover, it is undisputed that it was enacted as a result of the alleged problems with the handicapped residents at the existing Adult Care Facilities run by Epicenter in the North End. (See Joint Exh. F.) (stating on its face that it was passed in response to concerns raised at a public hearing regarding the Adult Care Facilities and the residents of the Adult Care Facilities located in the North End—a clear reference to the handicapped residents at the Epicenter facilities).

#### b. Steubenville's Proposed Justifications

■ Steubenville takes the position that its ordinance complies with the FHAA, and it offers several justifications for that position. First, at the hearing on the preliminary injunction motion, the defendant's counsel stated that the ordinance was passed to buy time to "study other legislation," and the City Manager testified that the ordinance was to provide "a calming down period." (See also P.'s Exh. A at 13 (Mayor stating moratorium is needed to "give us some breathing room to sit back, talk ... compile all the data and hopefully at the end of the [moratorium] we can have some provisions in the law")). Second, the ordinance states that it was passed for the "preservation of public health [ & ] safety" of the residents of Adult Care Facilities and all other citizens of Steubenville. Third, Steubenville, through its pleadings and arguments at the hearing, makes reference to the notion that the ordinance was passed to control a problem of overconcentration of mentally handicapped residents in the North End.

The Court finds that Steubenville's actions are indefensible. First, the evidence demon-

---

**2.** Congress recognized that one of the most common forms of discrimination against the handicapped is through indirect means, i.e., by discriminating against those who provide housing to the handicapped. Accordingly, Congress explicitly made it illegal to "discriminate in the sale

... or otherwise make unavailable or deny, a dwelling to any buyer ... because of a handicap of ... a person intending to reside in that dwelling after it is sold ... [or because of a handicap of] any person associated with that buyer." 42 U.S.C. 3604(f)(1).

strates that the proffered justifications are mere pretexts for a more invidious motive. Second, the evidence proves that the proffered reasons for the discrimination are inadequate to justify the discrimination because the ordinance is irrationally overbroad.

 Any discrimination in housing that is based on unsupported stereotypes, prejudices, fear stemming from ignorance or generalizations, or aversion toward the handicapped is illegal. *See* 1988 U.S.Code Cong. & Admin.News at 2179. Discrimination in housing through zoning is only permissible if the discrimination is justified by legitimate health and safety concerns, *Marbrunak*, 974 F.2d at 47, or if the discrimination is "beneficial discrimination" in that it extends the principle of equal housing opportunity to the handicapped. *Bangerter*, 46 F.3d at 1504.

Like the hoods of Klansmen mask the faces of criminals, Steubenville's proffered justifications are nothing more than a disguise for the true animus behind Ordinance 1995–88: the evidence demonstrates that Steubenville enacted Ordinance 1995–88 as a means to halt the immigration of handicapped people into the city of Steubenville, not for the reasons proffered by the city. Certain of Steubenville's politicians sought a means to exclude more handicapped individuals from moving into "their city," and the method for meeting this goal was through the most obvious and unimaginative way, by eliminating the number of housing spaces available for the mentally ill. This is clear from the testimony of City Council members Sullivan, Petrella, and Mixon at the City Council hearing that resulted in the passage of Ordinance 1995–88. All three complained at that hearing about the very presence of the mentally handicapped in "their city." For example, Sullivan complained that the city could not "control" the handicapped, and he lamented that he "did not bring these

people here, we did not establish these homes." He repeatedly expressed his resentment about "taking care" of mentally disabled people other than "our own in Jefferson County." Councilman Mixon complained that "people are being brought in[to] [Steubenville], ... we got an obligation to take care of our own ... but we're like a warehouse for the surrounding [area].... It's just not fair." Based on this evidence, the Court rejects the proffered justifications as mere pretexts for the true motive behind the passage of the ordinance: the intent to impede the ability of mentally handicapped residents from moving to Steubenville.

Seeking to exclude the mentally impaired from moving into Steubenville by denying them access to housing violates the provisions of the FHAA. For that reason, the evidence demonstrates that the ordinance is invalid, just as obviously as an ordinance would be invalid if it were passed as a means to exclude racial minorities from moving to Steubenville.[3]

Even if the Court were to accept the reasons proffered by Steubenville as the true motives behind the passage of the ordinance, the evidence demonstrates that those reasons fail to justify the ordinance because the ordinance is grossly overbroad.[4] In evaluating putative justifications, a court shall keep in mind that any exceptions to the FHAA must be narrowly construed, *id.* at 1502, and that any discrimination must be narrowly tailored in the sense that it must be individualized to the needs and abilities of particular kinds of disabilities and must have a necessary correlation to the actual abilities of the persons upon whom it is imposed. *Marbrunak*, 974 F.2d at 47; *Potomac Group Home*, 823 F.Supp. at 1300.

Ordinance 1995–88 is not tailored to the individual disabilities of those handicapped people whom it would effect, nor is its geo-

**3.** This motive to limit the immigration of handicapped individuals into Steubenville raises a number of constitutional concerns given that individuals moving to the Adult Care Facilities originated from outside the State of Ohio. Thus, the question remains whether the ordinance violates the Privileges and Immunities Clause, the fundamental right to travel, or the Dormant Commerce Clause.

**4.** The Court believes that any person who reads the relevant law in the area would easily reach the same conclusion. Cities simply can't discriminate by "throwing the baby out with the bath water."

graphic reach reasonable. While the goal of City Council may have been to block Epicenter from establishing new housing for the mentally handicapped in the North End, the statute, as passed, prevents the establishment of any new Adult Care Facilities by any provider, regardless of whether the proposed occupants of such facilities would suffer from a physical rather than a mental disability and regardless of the area in which the homes would be built. Accordingly, the moratorium is invalid because it is overbroad.

### B. Irreparable Harm

Steubenville argues that the Court cannot grant an injunction because Epicenter will not suffer irreparable injury if the motion for an injunction is denied. According to the defendant, irreparable injury is a prerequisite to granting injunctive relief.

Apparently, once again, defense counsel has failed to read the controlling law in this area. First, the FHAA specifically provides that equitable relief is available where there is a violation of the statute, 42 U.S.C. § 3613(c)(1), so "the traditional showing of irreparable harm is not required." Baxter, 720 F.Supp. at 734 (citing Illinois Bell Tel. Co. v. Illinois Commerce Comm'n, 740 F.2d 566, 571 (7th Cir.1984)). Second, the Sixth Circuit has stated that "proving irreparable harm is not an absolute prerequisite to obtaining a preliminary injunction.... A court balances four factors in assessing whether it should issue a preliminary injunction." Golden v. Kelsey, 73 F.3d at 657 (emphasis and quotations omitted). Accordingly, although the Court considers the lack of any irreparable injury to Epicenter to be relevant, it is but one factor to consider.

Steubenville's transgression is worse than mere nonfeasance, however; essentially, Steubenville is asserting that this Court must sit idly by and permit willful discrimination against the handicapped simply because the city of Steubenville is willing and able to pay money damages at the end of this litigation. Steubenville has expressed this disrespect for the law since the origins of this dispute. Testimony given at the City Council hearing that preceded the passage of the ordinance demonstrates that the members of the City Council understood the constraints of federal anti-discrimination law but flouted the law. Councilman Sullivan, for example, understood that he could not "control" the handicapped any more than he could other protected minorities. He also stated his understanding that Steubenville's "hands are tied" when it came to regulating where the handicapped could live and that attempts to discriminate against the handicapped would result in Steubenville "being sued for civil rights violations." Councilman Petrella stated that Steubenville was "limited in its powers to control certain issues." Councilman Mixon announced that he and Councilman Petrella had met with State of Ohio officials about the city's concerns and that the State told them that their ability to restrictively zone the area was limited. The City Manager testified that he understood that there existed a "long history of federal court cases with regards to attempts to zone out group home accommodations." And, after citing several cities that tried unsuccessfully to "zone out" group homes, the City Manager also stated his understanding that "we are really restricted in how far you can go in regulations." The City Attorney then explained to City Council that he believed the Supreme Court had issued a decision in which the Supreme Court held that federal law "prohibits a city from [discriminating against the handicapped by] regulating and limiting [group homes for the handicapped.]" Thus, the record clearly shows that the members of City Council knew that law, existing at the time of the enactment of the ordinance, prohibited Steubenville from discriminating against the handicapped through restrictive zoning ordinances. Nonetheless, its members chose to ignore the law; and now Steubenville takes the position that this Court is powerless to stop the city from continuing this illegal discrimination until the end of this litigation because Steubenville is willing and able to compensate Epicenter with money. Steubenville takes this position even though its discriminatory conduct may be criminal. See 42 U.S.C. § 3631(a) (providing that anyone who willfully interferes with or attempts to interfere with the housing rights of the handicapped shall be punished criminally).

The law does not permit a person to buy the right to discriminate against the handicapped in exchange for money damages, and common sense should have dictated to Steubenville and defense counsel that the law does not divest the Court of its equitable power of injunction simply because a defendant is willing to pay for the right to discriminate. Put simply, a showing of irreparable harm is not a prerequisite to this Court's equitable powers to enjoin illegal discrimination against the handicapped.[5]

█ In addition, although Epicenter will not suffer irreparable harm, it is clear that irreparable harm will be suffered by the handicapped community unless the Court grants an injunction. A "person's quality of life depends largely on where he or she lives." Arlene S. Kanter, *A Home of One's Own: The Fair Housing Amendments Acts of 1988 and Housing Discrimination Against People with Mental Disabilities,* 43 AMULR 925, 928 (Spring 1994). Depriving members of the handicapped community of the right to live where they choose "deprives [the handicapped] of much of what makes for human freedom and fulfillment—the ability to form bonds and take part in the life of a community." *Cleburne,* 473 U.S. at 461, 105 S.Ct. at 3265. The handicapped community suffering these harms cannot be compensated with money. Accordingly, the Court finds that the handicapped community will suffer irreparable harm.

### C. Harm to Steubenville

█ The residents of Steubenville will not suffer any harm by the issuance of an injunction. As stated above, the only threatened harms which Congress found to be relevant in determining whether a city can discriminate against the handicapped in the provision of housing are those harms which jeopardize health and safety or undermine the principle of extending equality in housing to the handicapped. In this case, the public health and safety problems of which the city complains (*i.e.,* loitering, indecent exposure, public defecation, *etc.*) can be dealt with

through the enforcement of existing municipal or state laws and regulations. Moreover, the evidence does not demonstrate that the addition of sixteen more handicapped residents to the North End of the city would create an overconcentration of the mentally impaired so as to harm the handicapped by undermining their right to equality in housing.

### D. The Public Interest

An injunction in this case furthers the public interest in two ways. First, an injunction helps to assure that handicapped individuals who are able to live relatively independent lives will be mainstreamed rather than remain as or become wards of the state. Second, the public will not tolerate people who act illegally, particularly those who do so willfully.

### E. Balancing the Factors

█ The balance of the factors weighs in favor of a preliminary injunction. Epicenter has not demonstrated that it will suffer irreparable injury, but it has demonstrated that the handicapped community will. Moreover, Epicenter has demonstrated that there exists a substantial likelihood that it will succeed on the merits, that Steubenville will not suffer any harm from an injunction, and that the public interest favors an injunction. Accordingly, the Court finds that a preliminary injunction is appropriate in these circumstances.

### III. CONCLUSION

For all the above reasons, Epicenter's motion has merit. Recognizing such, the Court granted Epicenter a preliminary injunction on March 26, 1996. Accordingly, the city of Steubenville is prohibited from enforcing Ordinance No. 1995–88. The city of Steubenville must proceed with any inspections and approvals which the State of Ohio requires the plaintiff to obtain from Steubenville prior to the issuance of a license to operate a new Adult Care Facility. Any attempts to violate

---

5. In this Court's Order, dated March 26, 1996, granting the preliminary injunction, the Court stated that the plaintiff had demonstrated that it would suffer irreparable injury. The Court hereby VACATES that finding.

this injunction will be remedied through civil contempt proceedings or punished through criminal contempt proceedings.

**IT IS SO ORDERED.**