**REMED RECOVERY CARE CENTERS,**

v.

**TOWNSHIP OF WILLISTOWN, CHESTER COUNTY, PENNSYLVANIA, et al.**

**Civil Action No. 98–2921.**

United States District Court, E.D. Pennsylvania.

Feb. 10, 1999.

---

Howard A. Rosenthal, Pelino & Lentz, P.C., Phila, PA, for Plaintiff.

Robert G. Hanna, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Harrisburg, PA, for Defendants.

## *MEMORANDUM*

GILES, Chief Judge.

ReMed Recovery Care Centers ("ReMed"), brings this action against the Township of Willistown, Pennsylvania ("Willistown") and the Township's Zoning Hearing Board ("Board"), under the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.* ReMed seeks an injunction preventing Willistown from enforcing its zoning ordinance so as to prohibit ReMed from bringing three additional patients to reside in the Willistown Home, a group home for brain-injured adults located in a district zoned for single-family residential use.

Now considered is ReMed's Petition and Motion for a Preliminary Injunction. The court has received written evidence and briefs from both parties and has heard oral argument. For the reasons that follow, the court preliminarily enjoins Willistown from enforcing against the Willistown Home the zoning ordinance limit on the number of unrelated persons who may reside in a residential area. ReMed shall be permitted to bring three additional residents into the Willistown Home, pending further proceedings and a final determination of whether to make the injunction permanent.[1]

### Findings of Fact

*The Parties*

1. ReMed is a for-profit limited partnership, engaged in the business of providing treatment, therapy, and rehabilitation services to handicapped persons with brain injuries, autism, and other disabilities. ReMed operates residential programs in supervised group homes and apartment settings. These programs allow brain-injured individuals to live in a home environment while undergoing rehabilitation and to continue to live on their

---

1. The court initially granted ReMed the requested injunctive relief in a ruling from the bench at the conclusion of the hearing in November. This opinion explains the court's reasoning.

own as much as possible. Residents may stay short-term or long-term in ReMed homes, depending on their age, the nature of their injuries, and their personal situations.

2. Ross H. Reider ("Reider") is ReMed's chief executive officer and lone general partner; he founded ReMed in 1984. ReMed currently operates ten group homes in the Greater Philadelphia area.

3. ReMed employs 275 people. ReMed homes are staffed by counselors with bachelor's and master's degrees; many ReMed employees are licensed in psychology, physical therapy, occupational therapy, and speech and language pathology. Counselors undergo training related to the care of brain injuries and interaction with people with brain injuries, as well as cardio-pulmonary resuscitation and crisis intervention and management. ReMed is licensed to operate these homes by the Pennsylvania Department of Public Welfare and maintains a three-year accreditation from the Commission on Accreditation of Rehabilitation Facilities.

4. Defendants are the Township of Willistown, which promulgated and enforces the zoning ordinance at issue in this case, and the township's Zoning Board, which denied ReMed's application for a variance from the limit on the number of unrelated persons who could reside in a single-family residential neighborhood.

*The Willistown Home*

5. Sometime in 1996, ReMed decided to reorganize some of its homes, placing two short-term care homes on a ten-acre property in Malvern, Pennsylvania and relocating residents of its long-term facility elsewhere. Eight residents were to be moved into a home in Schuylkill Township, Pennsylvania; eight more were to be moved onto a new property.

6. In August 1997, ReMed purchased a six-bedroom house located at 84 Devon Road, Willistown. The property is located on 3.5 acres, with frontage of approximately 300 feet and depth of over 478 feet. ReMed paid $460,000 for the home. ReMed also paid for various renovations to make it suitable for use as a group home, including the installation of wheelchair ramps in accordance with township building codes. The property is the second of three houses on Devon Road, which essentially is a private lane serving those three houses.

7. The Willistown Home is designed to provide a non-institutional residential environment. Residents function similar to a family, assisted by counselors who are present at all times, two or three during the day, one overnight. Residents prepare and eat meals together, perform chores such as cleaning and shopping for food, and provide social comfort and support to one another. Individuals often form close friendships with other residents. Many residents do some form of work outside the home, either paid or volunteer, full-time or part-time. Individual residents generally keep their own schedules and routines during a typical day; meals, work, therapy, and other activities during the day are not scheduled for the residents.

8. The Willistown Home is designed to blend into the residential character of the neighborhood. There are no bulk deliveries of food or special equipment made from large trucks; there are no doctors or nurses on the premises throughout the day. ReMed installed the wheelchair ramps according to township code and did not install any special fences or alarm systems. Counselors arrive at the Home in their own cars, as do therapists and other visitors. These are the only sources of traffic on the street related to the Home; none of the residents in the Willistown Home is permitted to drive. ReMed did not expand the parking or driveway areas on the property and does not plan to do so..

9. The residents in the Willistown Home are men ranging in age from 25 to 35 years of age and most will remain in the home for many years. Most sustained brain injuries as a result of accidents or from strokes suffered at an early age. Several are confined to wheelchairs. However, individuals who would be expected to be violent or aggressive, or who would otherwise be difficult to control, will not reside there.

10. ReMed purchased the Devon Road property with the intention of placing eight residents there, the number that Reider has

determined would be the most advantageous. ReMed believes, among other things, a) that eight residents would enable it to keep together people who get along well and who want to live together; b) that there are therapeutic and social benefits to the residents from having eight people in the home and from the mix of abilities that each brings to the group environment; and c) that eight residents would permit ReMed to provide three staff people at the home from 8 a.m. to 11 p.m. and one staff person overnight from 11 p.m. to 8 a.m. This allows for "practical flexibility" for the residents, in that at least one staff person would remain at the home to assist other residents at all times. Reider bases this belief on his experience in operating other group residences for ReMed.

11. ReMed also has determined that, given the cost of purchasing and renovating the house at 84 Devon Road, as well as the costs of operating the Home, eight residents are necessary to make the Willistown Home economically viable and to enable ReMed to earn a small profit, although eight residents would not necessarily enable ReMed to "maximize" its profits. None of the residents could live on Devon Road if ReMed did not operate the Willistown Home there.

12. ReMed owns and operates another home in Willistown, in a three-bedroom house located at 10 Manor Lane. Three people reside in that home and ReMed has agreed that no more than five people will reside there at any one time. The Manor Road Home functions in the same manner as the Willistown Home, although the residents there have different needs. Staffing and services are more intensive at Manor Lane; there generally are three staff people for the three residents at Manor Lane. The residents there generally are older and not as interested in socializing with their house mates.

13. The property at 84 Devon Road is located in an R–1 Residence District in Willistown, which limits permissible use of property to single-family dwellings. "Family" is defined in relevant part as "[a]ny number of individuals living together as a single, non-profit housekeeping unit . . . which said individuals are related by blood, marriage, or adoption" or "*no more than five unrelated individuals living together as a single non-profit housekeeping unit and doing their cooking in one kitchen on the premises.*" (Willistown Zoning Ordinance § 139–6) (emphasis added) (the "Ordinance"). The Willistown Home, if limited to five residents, operates within this definition and would be permitted in an R–1 Residence District.

14. ReMed applied for a building permit to allow it to begin the renovations to the Devon Road house. Willistown granted this permit after ReMed agreed in September 1997 that no more than five people would reside there unless ReMed first obtained approval from the Board or from a court of law. ReMed informed Willistown at that time that it would be filing an application with the Board to gain approval for additional residents.

15. Five residents moved into the Willistown Home in February 1998, upon completion of renovations on the house. A sixth person, who previously had lived with the other five in a different ReMed home for quite some time, and who had developed a close relationship with them, was prohibited from moving in at that time. Two other ReMed clients have expressed an interest in moving onto Devon Road.

16. The only incident described by the parties requiring police response at the Home since the residents moved in occurred when someone accidentally set off the new burglar and fire alarm, requiring police to respond to the scene.

*Application to the Zoning Hearing Board*

17. In December 1997, ReMed filed a Zoning Hearing Application with the Board, seeking a reasonable accommodation under the Fair Housing Amendments Act or challenging the validity of the Ordinance as being discriminatory against disabled individuals.[2]

18. The Board held three days of public hearings on ReMed's application. It heard

---

2. The Board concluded that it had jurisdiction to consider the validity of the ordinance and held the ordinance to be valid under the FHAA.

testimony from Reider and from Dr. Thomas H. Graham, a medical doctor with expertise in neurology. The Board also received into evidence a letter from William and Deborah Bone, neighbors of the home on Devon Road, who expressed concern that the Home would lead to a deterioration of, and decline in, the residential character of the community.

19. Dr. Graham offered opinion that there was no medical or therapeutic need for the Home to house eight rather than five residents. He also testified as to some general behavioral problems exhibited by some brain-injured individuals, notably aggressive and violent behavior. He acknowledged, however, that there is no single type of behavioral effect on all brain-injured people; rather the effects vary from person to person. Dr. Graham also expressed special concern with residents "going AWOL" and leaving the Home unattended and with one counselor being unable to monitor all eight during the night.

20. The Bones expressed their belief that head-injured adults do not belong in a single family residential neighborhood because of their unpredictable behavior and that increasing the number of residents in the Home from five to eight only would multiply the security risk to the community. They noted the risk of residents wandering from the home and onto neighboring properties. The Bones also stated that they had noticed an increase in traffic from ReMed employees driving on the street, often at high speeds, and adding noise and accident concerns to the neighborhood.[3] The Bones also complained about ReMed's use of spotlights and the color of part of the roof, both of which they claim are inconsistent with the residential character of the neighborhood. However, there is no evidence in the record that either the roofing or the spotlights are prohibited by Willistown zoning laws.

21. In May 1998, the Board rendered its decision and denied ReMed's application. The Board held that the limitation to five unrelated persons in an R–1 Residence District did not violate federal law and that the requested reasonable accommodation to allow three additional residents was not necessary.

22. The Board stated that it "did not find that the proposed use of the Property at 84 Devon Road by eight handicapped individuals will have a substantial and negative impact upon the purposes and effects of the existing zoning regulations." The Board did, however, recognize the concerns expressed by the Bones for the residential character of the neighborhood and the risk of damage to that character from the Willistown Home.

23. The Board based its legal analysis on a decision from the United States Court of Appeals for the Fourth Circuit, *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597 (4th Cir.1997). Following that case, the Board concluded that ReMed had failed to carry its burden of proving that the accommodation was both reasonable and necessary to afford handicapped persons the equal opportunity to use and enjoy housing. Specifically, the Board found that ReMed had failed to establish a causal connection between the requested accommodation of three more residents and the opportunity for those residents to reside in a group home, because ReMed operated other group homes in Willistown. The Board also found that ReMed had not presented any evidence that the accommodation was necessary to make the property financially viable or that the expansion would be "therapeutically meaningful."

24. ReMed then brought the instant action and moved for a preliminary injunction. In support of that motion, ReMed presented an affidavit from Reider in which he stated that the continued existence of the Willistown Home is in jeopardy and that ReMed has suffered losses of $74,000 through November 1998 due to the restriction on the number of residents. Willistown did nothing to rebut or contradict this evidence and in fact presented no new evidence to this court, relying on the Board's factual and legal conclusions.

25. If ReMed were unable to operate the Willistown Home, none of the residents would be able to reside at 84 Devon Road.

---

3. Reider responded on behalf of ReMed that the increase in vehicle traffic from having eight residents would not be any greater than what would be expected from a family of eight individuals.

ReMed will be financially unable to operate the Willistown Home with only five residents; therefore none of the residents ultimately will be able to reside at 84 Devon Road if the limit on residents is not expanded to eight.

## Conclusions of Law

### Nature of the Relief to be Granted

■ 1. Upon the conclusion of the hearing on ReMed's application for a preliminary injunction, it became clear that there were no factual disputes for this court to resolve at trial; rather the parties disagreed about the proper legal standard under the FHAA. Therefore this would seem to be an appropriate case in which to consolidate a trial on the merits with the hearing on the application for a preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2). However, any such consolidation requires "clear and unambiguous notice" of intent to consolidate. *Anderson v. Davila*, 125 F.3d 148, 157 (3d Cir.1997) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Consolidation at the close of a hearing on a preliminary injunction is insufficient notice. *Anderson*, 125 F.3d at 158 (criticizing "district court's ninth-inning announcement" as providing the government with no opportunity to prepare and present a full-blown defense).

2. Consolidation is not *per se* improper absent some showing of prejudice to one of the parties. *See Id.* at 158 (citing *H & W Indus., Inc. v. Formosa Plastics Corp.*, 860 F.2d 172, 177 (5th Cir.1988)). In briefing the preliminary injunction, Willistown offered no evidence beyond the record created before the Zoning Board and has not evidenced intent to present additional evidence at a trial. Nor did it attempt to rebut the new evidence of financial hardship that ReMed presented in its application for the injunction. Here, the crux of the dispute is the proper legal standard to be applied under the FHAA

to generally undisputed or uncontested facts. While it does not appear that Willistown would suffer any prejudice from consolidation, this court consistent with *Anderson,* may address only the question of a preliminary injunction at this time.[4] Willistown will have an opportunity subsequently to present additional evidence on the issue of the permanent injunction.[5]

3. In deciding whether to issue a preliminary injunction, a district court must weigh four factors: 1) whether the movant has demonstrated a likelihood of success on the merits of its claim; 2) whether the movant will be irreparably injured by denial of the relief; 3) whether granting preliminary injunctive relief will result in greater harm to the defendant; and 4) whether granting preliminary injunctive relief is in the public interest. *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir.1994) (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985)); *see also Sullivan v. City of Pittsburgh*, 811 F.2d 171, 181 (3d Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987).

■ 4. Willistown does not challenge ReMed's standing to bring this action under the FHAA. The FHAA defines "aggrieved person" as any person who claims to have been injured by a discriminatory housing practice or believes that such person will be injured by a discriminatory housing practice that is about to occur. 42 U.S.C. § 3602(i)(1),(2). Courts have held that a person or company in the business of providing housing for handicapped persons that has been prevented from doing so due to alleged discrimination has standing to sue under the FHAA. *See Horizon House Developmental Serv., Inc. v. Township of Upper Southampton*, 804 F.Supp. 683, 692 (E.D.Pa.1992), *aff'd mem.*, 995 F.2d 217 (3d Cir.1993); *see also Growth Horizons, Inc. v. Delaware County,*

---

4. In its November 1998 bench ruling, the court stated its intent to grant the preliminary injunction and to make it permanent. Upon consideration of *Anderson*, the court modifies that relief to the grant of preliminary injunctive relief only.

5. Absent presentation of new evidence, a district court may convert an opinion granting a preliminary injunction into one granting a permanent

injunction by expressly recasting its findings and conclusions in terms of the proper legal standard applicable to a permanent injunction. *CIBA-GEIGY Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 847 (3d Cir.1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985).

983 F.2d 1277, 1281–82 (3d Cir.1993); *Epicenter of Steubenville, Inc. v. City of Steubenville*, 924 F.Supp. 845, 849 (S.D.Ohio 1996) (citing cases). By being restricted in, and perhaps *de facto* prohibited from, operating the Willistown Home, ReMed has suffered a distinct and concrete injury sufficient to confer standing. *See Growth Horizons*, 983 F.2d at 1282; *Horizon House*, 804 F.Supp. at 692.

*Likelihood of Success on the Merits under the Fair Housing Amendments Act*

5. The express legislative purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Act was amended in 1988 to protect persons with handicaps. This circuit has recognized the 1988 expansion as a "clear pronouncement of a national commitment to *end the unnecessary exclusion of persons with handicaps* from the American mainstream." *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1105 (3d Cir.1996) (emphasis in original) (quoting *Helen L. v. DiDario*, 46 F.3d 325, 333 n. 14 (3d Cir.) (quoting in turn H.R.Rep. No. 711, 100th Cong., 2d Sess. 18, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179), *cert. denied*, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995)). The Supreme Court recognizes the FHAA's "broad and inclusive compass, and therefore, accord[s] a generous construction to the Act's complaint-filing provision." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) (internal quotation marks omitted).

6. The FHAA defines "handicap" to mean a physical or mental impairment which substantially limits one or more of such person's major life activities; a record of having such an impairment; or being regarded as having such an impairment. 42 U.S.C. § 3602(h). Brain-injured persons, such as the residents and would-be residents of the Willistown Home, unquestionably qualify as handicapped persons under the Act.

7. The FHAA makes it unlawful, in relevant part, to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of … a person residing in or intending to reside in that dwelling …" 42 U.S.C. § 3604(f)(1)(B).

8. Any local ordinance that would require or permit any action that would constitute a discriminatory housing practice under the FHAA may be held invalid. 42 U.S.C. § 3615. A provision in a zoning ordinance such as Willistown's that defines who may constitute a "family" and that limits the number of non-related persons who may occupy a house in a single-family zone is not a maximum occupancy restriction and is not exempt from the strictures of the FHAA. *See City of Edmonds*, 514 U.S. at 738, 115 S.Ct. 1776.

9. Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). There thus are three distinct types of cases under the FHAA: intentional discrimination, discriminatory or disparate impact, and failure to make reasonable accommodations. *See Assisted Living Assocs. v. Moorestown Township*, 996 F.Supp. 409, 434 (D.N.J.1998). This court addresses the instant matter as involving a failure to make reasonable accommodations and does not reach ReMed's argument that the definition of family and the limit on the number of unrelated persons who may be considered a family is invalid in that it has a disparate impact on handicapped persons. *See City of Edmonds*, 514 U.S. at 731 n. 4, 115 S.Ct. 1776 (expressly declining to decide whether the provision defining "family" violates the prohibitions on discriminatory intent or application).

10. Section 3604(f)(3)(B) prohibits the enforcement of zoning ordinances and local housing policies in a manner that denies people with disabilities access to housing on par with that of those who are not disabled; it places upon a municipality an "affirmative duty" to make reasonable accommodations. *Hovsons*, 89 F.3d at 1104 (citations omitted). Municipalities must change, waive, or make exceptions in their zoning rules to afford people with disabilities the same opportunity

to housing as those who are without disabilities. *See Horizon House*, 804 F.Supp. at 699–700.

■ 11. The Third Circuit expressly places on the government the burden of proving that the accommodation proffered by a plaintiff is not reasonable. *Hovsons*, 89 F.3d at 1104; *contra Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 603–04 (4th Cir.1997) (placing on the plaintiff the burden of proving that an accommodation is both reasonable and necessary; explicitly noting its departure from the approach of the third circuit); *Elderhaven, Inc. v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir.1996). In relying on *Bryant Woods*, the Board unquestionably applied an incorrect legal standard in reaching its decision.

■ 12. The requirement of reasonable accommodations to satisfy the FHAA "can and often will involve some costs." *Hovsons*, 89 F.3d at 1104. The third circuit held that a municipality such as Willistown may prove any one of three things to establish that a proposed accommodation is unreasonable:

> that it could not have granted the variance without [1] 'imposing undue financial and administrative burdens,' *Southeastern Community College v. Davis*, 442 U.S. 397, 412, 99 S.Ct. 2361 ... [2] imposing an 'undue hardship' upon the Township, ... or [3] requiring 'a fundamental alteration in the nature of the program....' *Davis*, 442 U.S. at 410, 99 S.Ct. 2361."

*Hovsons*, 89 F.3d at 1104. This inquiry is highly fact-specific and requires a case-by-case determination. *Id.*

13. Willistown has not carried its burden of proof. The Board expressly found that the use of the Willistown Home by eight handicapped individuals would not have a substantial and negative impact upon the purposes and effects of the existing zoning regulations of Willistown. There is no evidence that eight residents would impose any greater financial or administrative burden in

terms of the use of city or emergency services. The one reported incident of the Home requiring city services occurred when a burglar and fire alarm was set off accidentally, a common occurrence in many residential homes. Willistown has not presented any evidence to this court to show that the accommodation presents any undue hardship or burden or would require any fundamental alteration to the town's zoning laws.

14. There was concern by some residents that the presence of brain-injured persons was inconsistent with a residential neighborhood and threatened the safety of neighborhood residents. Dr. Graham echoed some of this concern with his expert testimony about the behavioral problems *sometimes* associated with *some* brain injuries and about the risk of ReMed residents wandering *some* neighborhoods. However, while such testimony may go to the question of whether a residential home for handicapped persons should be at 84 Devon Road, or in any other residential neighborhood, in the first place,[6] it is not probative of the question whether, given that the Willistown Home already is lawfully operating on Devon Road, it should be allowed to accommodate three additional residents. The testimony amounts to generalized, subjective, speculative concerns about having brain-injured people in the neighborhood and does not prove in any way that adding three residents poses some unique threat to the safety or character of the neighborhood.

15. Moreover, ReMed has shown that the residents of the Willistown Home operate as would any family that lived at 84 Devon Road, especially one with a brain-injured family member. The traffic from staff and visitors is comparable to the traffic that would be expected from any family living in the area. No large deliveries of food or other services are made regularly by trucks. The house and property have been made to fit as much as possible into the neighbor-

---

6. In general, the FHAA would require that this court answer that question in the affirmative. *See Hovsons*, 89 F.3d at 1106 (holding that the FHAA does not permit a township to do nothing to accommodate handicapped persons who are in need of special home care and desire to live in a residential zone); *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795–96 (6th Cir.1996) (holding that elderly disabled citizens have a right to live in single-family neighborhoods and to do so in homes that make such living possible); *Assisted Living Assocs.*, 996 F.Supp. at 436.

hood, with no special fences or gates, and aside from the installation of wheelchair ramps, to look the same as other buildings in the neighborhood.[7] The presence of spotlights perhaps makes the Home stand out, but it is not violative of any zoning ordinance.

16. The crux of the legal dispute concerns the "necessary" prong of § 3604(f)(3)(B), specifically what ReMed must show to establish that an accommodation is necessary to afford handicapped persons equal opportunity in housing. At oral argument, Willistown suggested that *Bryant Woods* could be read consistently with *Hovsons*. Under this approach, the plaintiff would bear the burden of proving that a proposed accommodation is necessary and only then would the burden shift to the town to show that the accommodation is unreasonable. Willistown argues that ReMed requested the accommodation but offered no evidence that it was necessary. The Board found that ReMed had not shown any causal connection between the requested accommodation and the opportunity for a person to reside in a group home, nor had ReMed shown therapeutic necessity of having three additional residents.

17. ReMed argues that its burden on this prong is much lighter—that it simply must show that, absent the requested reasonable accommodation, handicapped persons will be unable to live in the particular dwelling of their choice in a particular neighborhood of their choice. *See Smith & Lee*, 102 F.3d at 795 ("Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice."); *Hovsons*, 89 F.3d at 1105 (stating that the FHAA was intended to prohibit regulations that deny handicapped individuals the right *"to live in the residence of their choice in the community"*) (emphasis in original); *City of Edmonds v. Washington State Bldg.Code Council*, 18 F.3d 802, 806 (9th Cir.1994) ("Congress intended the FHAA to protect the right of handicapped persons to live in the residence of their

choice in the community."), *aff'd, City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995); *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1185–86 n. 10 (E.D.N.Y.1993) (stating that a handicapped individual must be allowed to enjoy a particular dwelling, not just some dwelling somewhere in town).

■ 18. As a threshold, a plaintiff must establish that absent the accommodation handicapped persons will be denied the opportunity to live in the particular dwelling or neighborhood of their choice. *See* cases cited *supra* ¶ 17. ReMed has made such a showing. Clearly, three ReMed clients will be unable to live at 84 Devon Road without the accommodation, including one client who had an established relationship with the other residents of the Willistown Home. ReMed also has shown that none of its residents could live on Devon Road without ReMed and that the Willistown Home cannot financially continue to operate on Devon Road absent the accommodation. It follows that none of these residents could live on Devon Road absent the accommodation. The fact that other housing in and around Willistown is available for ReMed residents does not render unnecessary the accommodation that would enable ReMed residents to live in the house of their choice, the one at 84 Devon Road. *See Oxford House*, 819 F.Supp. at 1185–86 n. 10; *Oxford House–Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1344 (D.N.J.1991); *but see Bryant Woods*, 124 F.3d at 605 (stating that a handicapped person desiring to live in a group home can do so in the plaintiff home if a vacancy exists or in one of the "numerous other" group homes). Moreover, ReMed has shown that the Manor Lane Home is intended for a different type of resident and does not provide a true alternative for the individuals who would reside in the Willistown Home.

19. Defendants point to the supposed absence of evidence of therapeutic or fiscal

---

7. Willistown's arguments, particularly as they relate to concerns for ReMed residents wandering the neighborhood, place ReMed in a Catch–22. ReMed did not install special fencing on its property and the township now points to the risk of residents wandering off the property as evidence

that the accommodation is unreasonable. If ReMed had installed special fencing to reduce such wandering, the township likely would argue that such fencing is inconsistent with the residential character of the neighborhood.

necessity. However, ReMed presented to this court uncontested evidence of the economic need for the variance, showing that it lost money in 1998 by operating the Willistown Home with only five residents and that its continued ability to operate the Home is in jeopardy.[8] Reider's experience in operating ReMed also reasonably indicates that there would be social and staffing benefits gained from an increase to eight residents in the Willistown Home. While this perhaps does not constitute therapeutic necessity in the strictly medical sense, evidence of such benefits to the residents does tend to establish that an accommodation is necessary under § 3604(f)(3)(B).

20. This court rejects the *Bryant Woods* approach under which the fact that other similar homes operate without a variance for additional residents negates necessity, without any consideration of the needs of a particular care-provider or of individuals' desire to reside in a *particular* group home. *See Bryant Woods*, 124 F.3d at 605. The fact that other homes in and around Willistown operate with only five residents is not conclusive on the question of necessity.[9]

21. Rather, a court properly can and should consider the specific, unique facts of a particular home, a particular care provider, and particular residents that might warrant an accommodation. *See Smith & Lee*, 102 F.3d at 796 (noting differences in the fiscal needs of "contract" and "non-contract" homes when considering economic viability in determining the necessity of a proffered accommodation). The evidence in this case suggests that ReMed was attempting to create a specific type of home for a specific type of individual: younger, longer-term residents, connected to the community and to their house mates, needing a larger, more social environment, and therefore in need of a larger house and more than the ordinance

limit of five residents. That constitutes proof of the necessity of the accommodation. The Manor Lane home is designed for a different type of resident with different needs. That it is able to operate with five or fewer residents is not dispositive on the question of whether the Willistown Home is able to do the same.

22. This court also rejects the *Bryant Woods* court's disregard for the profit-making concerns of the particular care provider. *See Bryant Woods*, 124 F.3d at 605 (holding that the proper inquiry is not whether a particular profit-making company needs such an accommodation). The impact of a proposed accommodation on the care provider's ability to earn a profit is relevant to the necessity inquiry, whether that accommodation makes the care provider viable or if it simply enables the provider to earn a small profit. It therefore is relevant not only that ReMed's ability to continue operating the Willistown Home will be jeopardized absent the accommodation, but also that ReMed will be able to earn some small profit if it is granted the accommodation to operate with eight residents.

23. Willistown cites *Oxford House–C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir.), *cert. denied*, 519 U.S. 816, 117 S.Ct. 65, 136 L.Ed.2d 27 (1996), to support its position that ReMed must make a substantial showing of necessity in order to shift the burden as to reasonableness to the township. However, the plaintiff in that case flatly refused to apply for a variance and it was that refusal that the Eighth Circuit held was "fatal to its reasonable accommodation claim." *Oxford House–C*, 77 F.3d at 253. That case provides no guidance as to what the plaintiff must show once it applies for the variance as an accommodation. Here ReMed did apply to the Board for a zoning variance. The only

8. Although ReMed apparently did not present this evidence to the Board, this court is not limited to consideration of the record before the Board and may consider new evidence presented by either party.

9. The fourth circuit suggests that such an individualized approach would enable one business to get an accommodation simply by unreasonably inflating costs. *Bryant Woods*, 124 F.3d at

605. Indeed, some of the questioning before the Zoning Board focused on the cost of the house at 84 Devon Road. Such a concern is indeed a valid one that a court should consider in the fact-intensive, case-by-case analysis of the necessity prong. However, this court does not believe that it should be a *per se* bar to considering the individual concerns of a particular care provider and a particular home.

question was whether it presented evidence of necessity. That it has done.

24. Based on the foregoing, the court concludes that the accommodation sought by ReMed to allow three additional residents in the Willistown Home likely is both necessary and reasonable under § 3604(f)(3)(B). ReMed has established a likelihood of succeeding on the merits of its substantive claim.

*Irreparable Harm*

25. The FHAA contains the following remedial provision:

> [I]f the court finds that a discriminatory housing practice has occurred or is about to occur, the court ... may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1).

26. Some courts have construed such an express Congressional grant of injunctive power to mean that the court can presume irreparable harm based on a showing that an FHAA violation has or is likely to occur. *See Rogers v. Windmill Pointe Village Club Assoc.*, 967 F.2d 525, 528–29 (11th Cir.1992) (per curiam, adopting district court order) (citing *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423–24 (11th Cir.), *cert. denied*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984)); *Assisted Living Assocs.*, 996 F.Supp. at 438–39 (collecting cases); *Epicenter of Steubenville*, 924 F.Supp. at 852. The Eleventh Circuit suggested that it is reasonable to presume that irreparable injury flows from discrimination in housing for several relevant reasons, including 1) that a person cannot remain "in limbo" while a court resolves the matter but must somehow find alternative, temporary housing that will result in disruption of community ties; and 2) that monetary relief cannot completely correct the loss of the opportunity to obtain housing of one's choice. *Rogers*, 967 F.2d at 528–29 (citing *Gresham*, 730 F.2d at 1423–24).

27. The third circuit has not addressed this question under the FHAA. The court has suggested that "a statutory provision authorizing preliminary injunctive relief upon a showing of probable cause to believe that the statute is being violated may be considered a substitute for a finding of irreparable harm for purposes of a preliminary injunction issued under Rule 65." *Gov't. of the Virgin Islands v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir.1983) (approving the result in *United States Postal Serv. v. Beamish*, 466 F.2d 804 (3d Cir.1972)); *see also Instant Air Freight v. C.F. Air Freight*, 882 F.2d 797, 803 (3d Cir.1989) (citing *Virgin Islands* with approval). The third circuit later cited *Virgin Islands* with approval for the idea that "the necessity of irreparable harm in light of a statute granting courts the power to issue preliminary injunctions varies with the particular statute involved." *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 400 (3d Cir.) (declining to apply the presumption in action to obtain monetary relief on a preliminary injunction under ERISA), *cert. denied*, 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991).[10] Several district courts in the circuit also have held that "because Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action." *United States v. Richlyn Labs., Inc.*, 827 F.Supp. 1145, 1150 (E.D.Pa. 1992) (Food, Drug, and Cosmetic Act case);

---

**10.** There is some uncertainty in the circuit. Between the time of *Virgin Islands* and *Rosa*, in a footnote the court called into question the import of *Virgin Islands*. *NRDC v. Texaco*, 906 F.2d 934, 940 n. 7 (3d Cir.1990). *See Assisted Living Assocs.*, 996 F.Supp. at 439 (discussing the impact of *Texaco*). However, it appears that the import of the footnote in *Texaco* is that a district court cannot dispense entirely with traditional equitable principles or consideration of all the factors for granting injunctive relief. Rather, in exercising its discretion, the court must evaluate and balance all the relevant elements. *See Virgin Islands*, 714 F.2d at 286 (stating that the public interest factor was important in that particular case). However, *Texaco* does not state that, in considering the irreparable harm prong in a case in which a federal anti-discrimination statute expressly empowers district courts to grant injunctive relief, the court may not require defendants to rebut a presumption of irreparable harm.

*see Assisted Living Assocs.*, 996 F.Supp. at 439 (FHAA case); *United States v. Barr Labs., Inc.*, 812 F.Supp. 458, 485 n. 29 (D.N.J.1993) (Clean Water Act case).

■ 28. In this circuit a presumption of irreparable harm is proper and appropriate under some statutes. *Rosa*, 938 F.2d at 400. Given the language of § 3613(c)(1) and the logic of the Eleventh Circuit in *Gresham, supra*, as to the nature and harms arising out of housing discrimination, the FHAA is one such statute. This court concludes, therefore, that the establishment of a violation of the FHAA creates a presumption of irreparable harm that a defendant must rebut in order for a preliminary injunction not to issue. In the instant case, Willistown has presented no evidence to rebut that presumption or to show that the plaintiffs will not suffer irreparable harm. Thus, the court concludes that the plaintiff will suffer irreparable harm absent the preliminary injunction.

■ 29. Alternatively, ReMed has shown sufficient evidence of irreparable harm to satisfy this prong even without the statutory presumption. There is one individual who previously had lived with the other five residents currently at the Willistown Home and who established a personal relationship with them, but now is unable to do so and will continue to be unable to do so absent the injunction. Two more individuals want to reside on Devon Road and continue to be unable to do so. ReMed also has stated that it is losing money from operating with only five residents and has suggested that it will be unable to continue to operate the Home without an injunction ordering this reasonable accommodation. The result is that all five current residents ultimately would be unable to reside at the Devon Road property. This is sufficient irreparable harm for purposes of granting preliminary injunctive relief.

### Harm to the Defendants

■ 30. Willistown has presented no evidence of any harm, burden, or cost that the township will suffer as a result of this injunction. In finding that the proffered accommodation was reasonable, *supra*, the court necessarily found that the township would not incur any additional costs or burdens if three additional residents moved into the home at 84 Devon Road. The concerns expressed by Dr. Graham and particularly by Mr. and Mrs. Bones for residents wandering off their property or otherwise threatening the safety of neighborhood residents amount to speculation and generalized, subjective fears, related to the mere presence of the Home on Devon Road, not to the particular requested accommodation. The court recognizes the interest the Township has in its zoning scheme and in its efforts to create and maintain residential areas. However, there is no evidence that such a scheme is threatened by permitting three additional residents to the Willistown Home.

### Public Interest

■ 31. The public interest in the protection and enforcement of civil rights and anti-discrimination laws generally weighs in favor of granting injunctive relief against violations. *See Oxford House–Evergreen*, 769 F.Supp. at 1345. This is especially true given the FHAA's broad construction and remedial scope. *See City of Edmonds*, 514 U.S. at 731, 115 S.Ct. 1776. Federal efforts to eliminate discrimination in housing reflect the public interest in this case and absent costs to the township, outweigh Willistown's interests in strictest enforcement of its zoning laws.

### Scope of the Injunction

■ 32. Willistown must make a reasonable accommodation, pursuant to § 3604(f)(3)(B), from its limitation on the number of unrelated persons that can constitute a family under the zoning ordinance. The township is preliminarily enjoined from enforcing the limit of five unrelated persons against the Willistown Home at 84 Devon Road. ReMed shall be permitted to move three additional residents into the Home and may operate the Home with no more than eight unrelated individuals living together as a family unit and doing their cooking in one kitchen on the premises. This injunction does not constitute a general waiver of a limitation of the number of unrelated persons

who may reside in the Willistown Home. *See Hovsons,* 89 F.3d at 1106 ("Congress surely did not mandate a blanket waiver of all facially neutral zoning policies and rules.").

33. This injunction shall remain in effect until such time as this court, upon the holding of trial and the receipt of additional evidence, if any, either makes the injunction permanent or vacates the injunction.

### Conclusion

For the foregoing reasons, Willistown is preliminarily enjoined from enforcing against the Willistown Home the limitation of five unrelated persons who may reside in one home as a family; three additional residents may move into the Home at 84 Devon Road.